**SIERRA CLUB, et al., Plaintiffs,**

v.

**Daniel GLICKMAN, Secretary of Agriculture, et al., Defendants,**

and

**Texas Forestry Association and Southern Timber Purchasers Council, Defendant–Intervenors.**

**No. 9:85–CV–69.**

United States District Court, E.D. Texas, Lufkin Division.

Aug. 14, 1997.

Mary Alice Van Kerrebrook, Meyer & Cribbs, Houston, TX, Douglas Loie Honnold, Sierra Club Legal Defense Fund, Bozeman, MT, Martha McCabe, Austin, TX, for Sierra Club.

Barbara Lowe, Philadelphia, PA, Ingrid Karin Hansen, Ashley Kingsland Wadick, Austin, TX, for Wilderness Society.

Edward C. Fritz, Dallas, TX, Barbara Lowe, Philadelphia, PA, for Texas Committee on Natural Resources.

Daniel A. Bowen, U.S. Dept. of Agriculture, Office of General Counsel, Temple, TX, for R. Max Peterson.

Ruth Harris Yeager, Asst. U.S. Atty., U.S. Attorney's Office, Tyler, TX, Jean Williams, U.S. Dept. of Justice, Martin W. Matzen, U.S. Dept. of Justice, Appellate Section, Kathryn Toffenetti, U.S. Dept. of Agriculture, Office of General Counsel, Washington, DC, Daniel A. Bowen, U.S. Dept. of Agriculture, Office of General Counsel, Temple, TX, Nadira Clarke, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, for John E. Alcock, William M. Lannan, F. Dale Robertson.

Ruth Harris Yeager, Asst. U.S. Atty., U.S. Attorney's Office, Tyler, TX, Wells D. Burgess, U.S. Dept. of Justice, Land & Natural Resources Div., Jean Williams, U.S. Dept. of Justice, Martin W. Matzen, U.S. Dept. of Justice, Appellate Section, Kathryn Toffenetti, U.S. Dept. of Agriculture, Office of General Counsel, Washington, DC, Daniel A. Bowen, U.S. Dept. of Agriculture, Office of General Counsel, Temple, TX, Nadira Clarke, U.S. Dept. of Justice, Land & Natural Resources Div., Stephanie M. Parent, Lisa A. Holden, U.S. Dept. of Justice, Environmental & Natural Resources, General

Litigation Section, Washington, DC, for Daniel Glickman.

Ruth Harris Yeager, Asst. U.S. Atty., U.S. Attorney's Office, Tyler, TX, Wells D. Burgess, U.S. Dept. of Justice, Land & Natural Resources Div., Jean Williams, U.S. Dept. of Justice, Kathryn Toffenetti, U.S. Dept. of Agriculture, Office of General Counsel, Washington, DC, Daniel A. Bowen, U.S. Dept. of Agriculture, Office of General Counsel, Temple, TX, for John R. Block.

Stephanie M. Parent, Lisa A. Holden, U.S. Dept. of Justice, Environmental & Natural Resources, General Litigation Section, Washington, DC, for Federal Defendants.

Ruth Harris Yeager, Asst. U.S. Atty., U.S. Attorney's Office, Tyler, TX, Wells D. Burgess, U.S. Dept. of Justice, Land & Natural Resources Div., Stephanie M. Parent, Lisa A. Holden, U.S. Dept. of Justice, Environmental & Natural Resources, General Litigation Section, Washington, DC, for Gloria manning, Michael Dombeck, Ronald Raum.

John C. Fleming, James Roy Cornelius, Zeleskey Cornelius Hallmark Roper & Hicks, Lufkin, TX, Stephen P. Quareles, J. Michael Klise, Thomas R. Lundquist, Crowell & Moring, Washington, DC, for Texas Forestry Ass'n, Southern Timber Purchasers Council.

## MEMORANDUM OPINION, ORDER, AND INJUNCTION WITH SUPPORTING FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE EVEN-AGED MANAGEMENT AND INVENTORYING–MONITORING ISSUES

SCHELL, Chief Judge.

The Sierra Club, Texas Committee on Natural Resources ("TCONR"), and The Wilderness Society (collectively "Plaintiffs") brought this action challenging the United States Forest Service's management of the National Forests in Texas. The Texas Forestry Association and Southern Timber Purchasers Council (collectively "Timber Intervenors") have intervened. The broad issue before the court is whether the Forest Service is complying with the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–14 and related regulations, 36 C.F.R. § 219.1–29 (hereinafter "NFMA regulations" or "regulations"). The NFMA and regulations generally require: (1) diversity of plant and animal communities as well as tree species, (2) protection of key resources, and (3) inventorying and monitoring for key resources, diversity, and effects of management activities. Considering the evidence adduced at trial, legal argument of counsel, and the parties' respective proposed findings of fact and conclusions of law, the court is of the opinion that the Forest Service has stepped outside its discretion and acted arbitrarily and capriciously with respect to (1) protecting the key resources of soil and watershed and (2) inventorying and monitoring the wildlife resource, forest diversity, and whether the Forest Service is meeting its objectives and adhering to standards and guidelines with respect to wildlife.

With respect to the soil resource, the evidence shows that the Forest Service's management activities are causing severe soil erosion and loss of essential organic matter. This loss of soil and organic matter substantially and permanently affects the productivity of the land. Without rich forest soil, plant and animal communities suffer as well as the forest land's ability to produce healthy timber stands. With respect to the watershed resource, Forest Service management practices are causing substantial and permanent (1) erosion within waterways, (2) deposit of soil, silt, and sedimentation in waterways, and (3) disruption of water run-off. Additionally, the Forest Services's practice of permitting timber harvesting in streamside management zones exacerbates the erosion and sedimentation problems and causes the deposit of logging debris in streams. This derogation of the streams (1) destroys plant, animal, and fish habitat and (2) contributes to flooding.

With respect to the Forest Service's inventorying and monitoring obligations, the Forest Service is not collecting population data on wildlife to ensure viable populations. The Forest Service instead is relying on hypothetical models to assess habitat capability and then assuming that viable populations of species are in existence and well-distributed on the forest land. The Forest Service's failure to collect population data forecloses its ability to evaluate forest diversity in terms of wildlife and to adequately determine

the effects of its management activities. The Forest Service's failure to adequately inventory and monitor may be causing permanent and substantial damage to the productivity of the land. Sufficient inventorying and monitoring of forest resources is vital to making sound, forest-management decisions and ultimately protecting the forest resources from permanent impairment. In light of the Federal Defendants' noncompliance with the NFMA and regulations, the court will enjoin certain timber harvesting activities until the Forest Service demonstrates compliance "on-the-ground."

## BACKGROUND

This case has spanned over a decade and involved many complex issues.[1] In this stage of the case, Plaintiffs allege that the Forest Service is violating the NFMA and regulations. The court articulated the issues for trial in a prior order:

> (1) Whether the Forest Service has, in practice, as required by the regulations, kept current and adequate inventories and monitoring data for key resources in the national forests in Texas; (2) Whether the Forest Service has, in practice, as required by the regulations, protected key resources in its application of even-aged management

techniques; and (3) Whether the Forest Service has, in practice, as required by the regulations, provided for diversity of plant and animal communities in its application of even-aged management techniques.

Court's Order of Aug. 21, 1995.

Plaintiffs previously challenged the Forest Service's even-aged management practices.[2] After the Chief of the Forest Service "shutdown" TCONR's administrative appeal, TCONR and the other Plaintiffs here sought (1) a declaration that the Forest Service's even-aged management practices did not comply with the National Environmental Policy Act ("NEPA"),[3] 42 U.S.C. § 4321, et seq. and the NFMA, and (2) an injunction against all even-aged management practices. *Sierra Club v. Espy,* 822 F.Supp. 356, 358 (E.D.Tex. 1993). Unlike the "on-the-ground" challenge now before the court, Plaintiffs argued that the Forest Service's planning documents[4] "on-their-face" violated NEPA and the NFMA. *Id.* at 359. The Honorable Robert M. Parker, then Chief Judge of the Eastern District of Texas, determined that the Forest Service was violating NEPA and the NFMA. *Id.* at 366–68. Specifically, in its planning documents, the Forest Service failed to consider important information and various cut-

1. The procedural history of this case is contained in prior opinions. *See Sierra Club v. Glickman,* 67 F.3d 90, 92–93 (5th Cir.1995) (Red–Cockaded Woodpecker); *Sierra Club v. Espy,* 38 F.3d 792 (5th Cir.1994) (even-aged logging); *Sierra Club v. Lyng,* 694 F.Supp. 1260, 1263–64, 1273–75 (E.D.Tex.1988) (Southern Pine Beetle), *aff'd in part and vacated in part sub. nom. Sierra Club v. Yeutter,* 926 F.2d 429 (5th Cir.1991) (addressing Red–Cockaded Woodpecker issues). This court declined to revisit the Southern Pine Beetle issue. Court's Order of Sept. 9, 1994.

2. A prior opinion in this case explains the timber harvesting methods:

> Broadly stated, there are two ways to manage a forest's timber resources. The first method is even-aged management. *See* 36 C.F.R. § 219.3. Even-aged management includes clearcutting, where all the trees are cut down; seed tree cutting, where most of the trees are cut down, leaving only a few to naturally seed the cut area; and shelterwood cutting, where about double the number of trees are left standing as would be under the seed tree method. Even under the least intrusive even-aged management technique, shelterwood cutting, only about sixteen trees per acre remain after a cut. Moreover, under seed tree

> cutting, the older trees left to naturally seed the cut area are later removed. Even-aged management results in stands of trees that are essentially the same age....
>
> The second method of timber resource management is uneven-aged management, also known as selection management. *See* 36 C.F.R. § 219.3. Uneven-aged management encompasses both single tree selection and group selection. Group selection involves cutting small patches of trees, while single tree selection involves selecting particular trees for cutting. Uneven-aged management maintains a continuous high-forest cover, and the stands are characterized by a number of differently aged trees.

> *Sierra Club v. Espy,* 38 F.3d at 795–96.

3. NEPA requires federal agencies to prepare a detailed Environmental Impact Statement for inclusion in major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). NEPA is incorporated into the NFMA by 16 U.S.C. § 1604(g)(1).

4. For a detailed discussion of these planning documents, see *Sierra Club v. Espy,* 38 F.3d at 795–96.

ting options. *Id.* The court reasoned that Plaintiffs were likely to succeed on their NEPA claims because the Forest Service had " 'swept' some significant environmental considerations and criticisms of its scheduled even-aged management actions 'under the rug,' or failed to give good faith, meaningful consideration to foreseeable, statutorily important, environmental consequences of its planned even-aged logging activities." *Id.* at 368. The court also reasoned that Plaintiffs were likely to succeed on their NFMA claims because the Forest Service used even-aged management as the "rule" when, in fact, the NFMA "contemplates that even-aged management techniques will be used only in exceptional circumstances." *Id.* at 363–64.

The Court of Appeals for the Fifth Circuit reversed the district court's decision. *Sierra Club v. Espy*, 38 F.3d at 795. The Fifth Circuit disagreed with the district court's interpretation that the NFMA provides that even-aged management is an exception to a rule of uneven-aged management.[5] *Id.* at 799. The Fifth Circuit stated:

> That even-aged management must be the optimum or appropriate method to accomplish the objectives and requirements set forth in a [Land Resource Management Plan] does not mean that even-aged management is the exception to a rule that purportedly favors selection management. Similarly, the requirement that even-aged logging protect forest resources does not in itself limit its use. Rather, these provisions [in the NFMA] mean that the Forest Service must proceed cautiously in implementing an even-aged management alternative and only after a close examination of the effects that such management will have on other forest resources.

*Sierra Club v. Espy*, 38 F.3d at 799. In making this determination, the Fifth Circuit relied on *Texas Comm. on Natural Resources v. Bergland*, 573 F.2d 201 (5th Cir. 1978) ("*Bergland* "). Following its reasoning in *Bergland*, the Fifth Circuit explained:

Congress, after hearing testimony on both sides of the clearcutting issue, struck a delicate balance between the benefits of clearcutting and the benefits of preserving the ecosystems and scenic quality of natural forests. Specifically, NFMA was an effort to place the initial technical, management responsibility for the application of NFMA guidelines on the responsible government agency, in this case the Forest Service. The NFMA is a set of outer boundaries within which the Forest Service must work. We then cautioned the Forest Service that clearcutting could not be justified merely on the basis that it provided the greatest dollar return per unit output; rather, clearcutting must be used only where it is essential to accomplish the relevant forest management objectives.

*Sierra Club v. Espy*, 38 F.3d at 798–99 (internal citations and quotation marks omitted).

The Fifth Circuit then determined that the Forest Service's timber-sale planning documents, *i.e.*, the Environmental Assessments, complied with the NFMA. Interpreting the NFMA and regulations, the Fifth Circuit stated:

> The directive that national forests are subject to multiple uses, including timber uses, suggests that the mix of forest resources will change according to a given use. Maintenance of a pristine environment where no species' numbers are threatened runs counter to the notion that NTMA contemplates both even- and uneven-aged timber management. Indeed, NFMA regulations anticipate the possibility of change and provide that "[r]eductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed

---

5. Creating a split between the circuits, the Sixth Circuit has determined that "[t]he National Forest Management Act thus contemplates that even-aged management techniques will be used only in exceptional circumstances." *Sierra Club v. Thomas*, 105 F.3d 248, 251 (6th Cir.1997). Reviewing a Land Resource Management Plan ("LRMP") that required that eighty percent of all logging would be even-aged, the Sixth Circuit determined that the Forest Service violated section 1604(g)(3)(F)(v) of the NFMA by failing to protect key resources. *Id.* at 249, 252. The Sixth Circuit explained political and economic factors that cause the loss of key resources in the National Forests despite the statutory requirements of the NFMA. *Id.* 251–52.

only where needed to meet overall multiple-use objectives." 36 C.F.R. § 219.27(g); *see also* 16 U.S.C. § 1604(g)(3)(C) (LRMP must ensure research and evaluation of effects of each management system to assure no *"substantial and permanent* impairment" of land productivity) (emphasis added); 16 U.S.C. § 1604(g)(3)(E)(i) (LRMP must provide that timber be harvested only where "soil, slope, or other watershed conditions will not be *irreversibly* damaged") (emphasis added). That protection means something less than preservation of the status quo but something more than eradication of species suggests that this is just the type of policy-oriented decision Congress wisely left to the discretion of the experts—here, the Forest Service.

*Id.* at 800. The Fifth Circuit, however, warned:

The Forest Service's discretion, however, is not unbridled. The regulations implementing NFMA provide a minimum level of protection by mandating that the Forest Service manage fish and wildlife habitats to insure viable populations of species in planning areas. 36 C.F.R. § 219.19. In addition, the statute requires the Forest Service to "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B).

*Id.* at 800–01. The Fifth Circuit interpreted the NFMA and regulations to actually require the Forest Service to comply with the law on-the-ground rather than merely including precatory standards and guidelines in its planning documents.

## JURISDICTION

The court has jurisdiction over this action. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Administrative Procedure Act ("APA"), 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to

judicial review." 5 U.S.C. § 704 " '[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act* . . . ." 5 U.S.C. §§ 551(13), 701(b)(2) (emphasis added). "When an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is final for the purposes of [section 704] and therefore subject to judicial review . . . ." *Darby v. Cisneros,* 509 U.S. 137, 146, 113 S.Ct. 2539, 2544, 125 L.Ed.2d 113 (1993) (internal quotation marks omitted). "While federal courts may be free to apply, where appropriate, other prudential doctrines of judicial administration to limit the scope and timing of judicial review, [section 704], by its very terms, has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates." *Id.*

■ Under the APA, this court has jurisdiction to review the Forest Service's failure to act with respect to alleged on-the-ground violations of the NFMA and regulations. NFMA regulations provide for administrative review of a Forest Service determination to make a specific sale of timber. 36 C.F.R. § 215.7. But no statute or regulation provides for an administrative review of agency actions after the sale with respect to implementing a LRMP in accordance with the NFMA. While an initial decision to offer a timber sale is appealable, subsequent implementing actions are not.[6] 36 C.F.R. § 215.8(b).

The Forest Service's failure to implement timber sales in compliance with the NFMA and regulations, as alleged by Plaintiffs, is a final agency action for purposes of section 704. Once the Forest Service adopted a final, definite course of action or inaction with respect to the management of the forest lands (regardless of whether that action or inaction is memorialized in a written agency decision), the court has a "final agency action" to review. A contrary view, held by the Federal Defendants and Timber Intervenors,

---

**6.** Defendants agree that no statute or regulation provides for an administrative review of agency actions after the sale, and that exhaustion of administrative remedies does not apply to an on-

the-ground review. *See* Federal Defs.' Br. on Exhaustion of Administrative Remedies at 4, 6–7; Timber Intervenors' Br. on Exhaustion of Administrative Remedies at 4 n. 2.

would put all of the Forest Service's on-the-ground violations of the NFMA and regulations beyond judicial review. Under this view, the Forest Service seeks absolute immunity from its on-the-ground management activities. Awaiting future Forest Service timber-sale or planning decisions would not assist the court in determining whether the Forest Service is complying with the law on-the-ground. For example, neither the 1996 Land Resource and Management Plan ("1996 LRMP") [7] nor any future timber sales under that Plan would put this court in a better position to determine whether the Forest Service has complied with the NFMA and regulations with respect to implementation of past timber sales.

Defendants argue that the issues before the court are moot because of the adoption of the 1996 LRMP that supersedes the 1987 LRMP. Federal Defs.' Proposed Findings of Fact and Conclusions of Law at 108–09; Timber Intervenors' Closing Argument on the NFMA Issues at 2–4. They also argue that the 1996 LRMP will govern all future timber sales and monitoring activities. A federal district court's jurisdiction depends on a justiciable controversy under the constitutional case-or-controversy requirement. *See* U.S. Const. art. III, § 2, cl. 1. A justiciable controversy is one that is not moot. "The mootness doctrine requires that the controversy posed by the plaintiffs complaint be 'live' not only at the time the plaintiff files the complaint but also throughout the litigation process." [8] *Rocky v. King*, 900 F.2d 864, 866 (5th Cir.1990). A live controversy must

have an injury traceable to the actions of the defendants and susceptible to some judicial remedy. *Baccus v. Parrish*, 45 F.3d 958, 961 (5th Cir.1995).

This action is not moot. Plaintiffs, as alleged, continue to suffer from the Forest Service's alleged past and ongoing violations of the NFMA and regulations. Plaintiffs allege that the Forest Service's even-aged logging activities, regardless of whether they are under the old or new LRMP, violate the NFMA and regulations with respect to implementation of past timber sales. If violations are ultimately determined to have been occurring, adoption of the 1996 LRMP does not guarantee that the Forest Service will comply on-the-ground with the NFMA and regulations. If continuing violations are found, the court can fashion a judicial remedy.

## STANDARDS OF REVIEW

Section 706 of the APA establishes the scope of review for this action. Section 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and

---

7. The Forest Service unveiled a new LRMP on March 28, 1996. *See* Gov't Ex. 243A, Revised Land and Resource Management Plan dated 1996 ("1996 LRMP"). The NFMA provides that forest plans should be revised or replaced at least every fifteen years. 16 U.S.C. § 1604(f)(5). Once a revised forest plan is issued, new timber "contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with" the revised plan. 16 U.S.C. § 1604(i).

8. There are three broad exceptions to the mootness doctrine: collateral consequences, wrong capable of repetition yet evading review, and voluntary cessation. *See* Erwin Chemerinsky, Federal Jurisdiction 128–39 (2d ed.1994). Under the "collateral consequences" exception, a case is not moot if an injury remains that could be redressed by a favorable court decision. *Id.* at

128. Under the "wrong capable of repetition yet evading review" exception, a case is not moot if the challenged action was too short in duration to be fully litigated while in existence and if there is a reasonable expectation that the plaintiff will again be subject to the same action in the future. *Id* at 131–32. Under the "voluntary cessation" exception, a case is not moot if there is a reasonable expectation that the plaintiff again will be subject to the unlawful conduct. *Id.* at 136. Even assuming that the issues before the court are not "live" (which they are), the court would continue to have jurisdiction because the Forest Service could continuously amend its 1996 LRMP to evade review. Furthermore, a Forest Service planning document or subsequent amendment may not necessarily ensure on-the-ground compliance with the NFMA and regulations.

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . .

5 U.S.C. § 706. The arbitrary and capricious standard of section 706 applies in determining whether the Forest Service has complied with the NFMA and regulations. *Sierra Club v. Espy*, 38 F.3d at 798. Under the APA's arbitrary and capricious standard, "administrative action is upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Sierra Club v. Glickman*, 67 F.3d at 97. In other words, to make a finding that the Forest Service's actions were arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

■ In determining statutory compliance with the NFMA, the court must conduct a careful review:

[T]he starting point in every case involving construction of a statute is the language itself. We must give effect to the unambiguously stated intention of Congress. In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy. However, an agency's construction of an ambiguous statute it administers will be upheld so long as that construction is reasonable.

*Sierra Club v. Espy*, 38 F.3d at 798 (internal quotation marks and citations omitted). In determining whether the Forest Service complied with its own regulations, a court must give even greater deference to the Forest Service's interpretation. The Forest Service's interpretation of its own regulations will control if that interpretation is not " 'plainly erroneous or inconsistent with the

regulations.' " *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359, 109 S.Ct. 1835, 1850, 104 L.Ed.2d 351 (1989) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Absent proof of arbitrary and capricious action, courts must assume that the agency has exercised its discretion appropriately. *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976). The party challenging the agency action bears the burden of proof. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

■ Federal officials or an agency are presumed to carry out their duties in compliance with the law. *Diaz–Soto v. I.N.S.*, 797 F.2d 262, 264 (5th Cir.1986) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823). "But that presumption is not to shield [agency] action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. Under this standard, the court must determine whether the agency's actions are within the substantive "outer boundaries" or limitations of the NFMA. *See, e.g., Bergland*, 573 F.2d at 210. "The NFMA is a set of outer boundaries within which the Forest Service must work. Within its parameters, the management decision belongs to the agency and should not be second-guessed by a court." *Id.*

■ In reviewing Forest Service management activities that require a high level of technical experience, a court must defer to the informed discretion of the Forest Service. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (citing *Kleppe v. Sierra Club*, 427 U.S. at 412, 96 S.Ct. at 2731). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861. A court, however, must hold the Forest Service to "certain minimal standards of rationality." *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 329 (5th Cir.1988) (internal citations and quotation marks omitted). For-

est Service decisions, even within its area of expertise, must be based on a reasoned evaluation of relevant factors. *See Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861–62.

 Timber Intervenors argue that the NFMA and regulations do not provide sufficient legal standards for a court to determine whether the Forest Service is complying with the law on-the-ground. Timber Intervenors state: "The NFMA and most of the regulations provide no law to apply to [Plaintiffs'] claims of on-the-ground violations." Timber Intervenors' Closing Argument on the NFMA Issues at 8. Timber Intervenors further argue that the NFMA and regulations merely require the Forest Service to plan management activities rather than actually carry them out on-the-ground. Timber Intervenors argue: "The NFMA and the 36 C.F.R. Part 219 regulations do *not* create standards which apply to on-the-ground effects of even-aged management." *Id.* at 6 (emphasis in original). Under the Timber Intervenors' interpretations of the NFMA and regulations, no federal court could review the Forest Service's management of the National Forests and determine whether the Forest Service is complying with the law on-the-ground. Under their interpretation, review would be limited to the facial content of the planning documents rather than actual, on-the-ground management activities. In essence, Timber Intervenors are proposing immunity for the Forest Service's actions on-the-ground.

While acknowledging the Forest Service's discretion in managing the forests, the Fifth Circuit, however, Circuit, however, has rejected the Timber Intervenors' interpretation of the NFMA and regulations:

> The Forest Service's discretion, however, is not unbridled. The regulations implementing NFMA provide a minimum level of protection by mandating that the Forest Service manage fish and wildlife habitats to insure viable populations of species in planning areas. 36 C.F.R. § 219.19. In addition, the statute requires the Forest Service to "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B).

*Sierra Club v. Espy,* 38 F.3d at 800–01. Here, as noted previously, the Fifth Circuit is interpreting the NFMA and regulations to require the Forest Service to comply with the law on-the-ground rather than merely including precatory standards and guidelines in its planning documents. Moreover, while section 1604(g) of the NFMA requires the Secretary of Agriculture to promulgate regulations for Forest Service planning, this section also mandates that the regulations set out guidelines for land management that actually achieve the goals set out for the Forest Service. *See, e.g.,* 16 U.S.C. § 1604(g)(3). "The NFMA and its implementing regulations require[ ] the Forest Service to follow a range of legal standards in developing local forest plans *and to manage the national forests in accordance with the plans.*" CHARLES F. WILKINSON & H. MICHAEL ANDERSON, LAND AND RESOURCE PLANNING IN THE NATIONAL FORESTS 45 (1987) (emphasis added). "The NFMA ... require[s] courts to scrutinize forest plans, and activities based on those plans, on both procedural and substantive grounds." *Id.* at 74. Therefore, based on the foregoing interpretations of the NFMA and regulations, there are sufficient legal standards available to review the Forest Service's actions. And, its actions are not wholly "committed to agency discretion by law" under section 701(a)(2) of the APA. *See, e.g., Webster v. Doe,* 486 U.S. 592, 599, 108 S.Ct. 2047, 2051–52, 100 L.Ed.2d 632 (1988) (noting that 701(a)(2) "applies in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply") (internal citations and quotation marks omitted).

## BACKGROUND FINDINGS

Throughout this opinion, all findings of fact that could be construed as conclusions of law are to be construed as such, and all conclusions of law that could be construed as findings of fact are to be construed as such. Findings of fact in any one section of this opinion are hereby incorporated into every other section. All findings of fact are to be construed as being made in the past and present verb tense. The citations to the trial record that follow some of the findings of fact are for the reviewing court's convenience and not necessarily inclusive of all the evidentiary support for the court's findings. Citations to

the trial-record transcript are indicated by "R. page/line(s)."

1. The National Forests and Grasslands in Texas are comprised of four separate forests and two grasslands. The total acreage for the National Forests and Grasslands is approximately 675,000 acres. R. 792/10–12; Gov't Ex. 15, Final Land Resource Management Plan dated April 1987 ("1987 LRMP"), at I–3.

2. The National Forests cover approximately 639,000 acres and are the Sam Houston, Davy Crockett, Angelina, and Sabine. R. 728/23 to 729/10, 776/12–20. There is no commercial timber harvesting on the grasslands, and therefore, the management of the grasslands is not at issue in this action. Gov't Ex. 15, 1987 LRMP, at IV–69. Findings of fact and conclusions of law in this opinion regarding acreage, volume, and percentages are limited to the four National Forests.

3. As of 1991: the Sam Houston National Forest contained approximately 161,000 acres; the Davy Crockett National Forest contained approximately 162,000 acres; the Angelina National Forest contained approximately 153,000 acres; and the Sabine National Forest contained approximately 160,600 acres. Gov't Ex. 19, Five Year Review/AMS dated March 1992 ("1992 Five Year Review"), at 16–3 to 16–4. Each National Forest has a proclamation boundary and within that boundary lies the actual United States Forest Service ownership. R. 751/24 to 752/4; Gov't Ex. 19, 1992 Five Year Review, at 16–3 to 16–4. The Forest Service owns 37% of the lands within the proclamation boundaries. *Id.;* Gov't Ex. 16, Draft Environmental Impact Statement dated September 1994 ("1994 DEIS"), at 124.

4. A map of the National Forests in Texas reveals a fragmented landscape that is the result of private holdings separating large segments of the forest and inholdings fragmenting even those more cohesive segments. Gov't Ex. 176.

5. The land for the forests was purchased in the late 1930s and early 1940s pursuant to the Weeks Act of 1911, as amended, and by authorization from the Texas Legislature. Gov't Ex. 15, 1987 LRMP, at 1–3; Gov't Ex. 19, 1992 Five Year Review, at 12–126.

6. The approximate 639,000 acres of the four National Forests are divided into compartments, which are administrative units to allow for more efficient management and record keeping. R. 873/13–19. Each compartment is divided into stands. R. 93/12–13.

7. The Forest Service deems approximately 521,018 acres to be suitable for timber production. Gov't Ex. 15, 1987 LRMP, at IV–11.

8. Although each stand and compartment is different, the activities occurring on Compartment 98 of the Sam Houston National Forest are generally typical of even-aged regeneration activities across the National Forests in Texas. R. 1258/20–23. Even-aged practices on one part of the planning area are generally similar to even-aged practices in other areas. R. 649/21 to 650/21.

## PROVIDING FOR DIVERSITY

*Findings of Fact*

1. The Forest Service in Texas began practicing even-aged management techniques in the early 1960s. Gov't Ex. 19, 1992 Five Year Review, at 12–128.

2. The even-aged system was the predominant management system used to regenerate timber under the 1987 LRMP. R. 764/9–11. The 1987 LRMP specified that approximately 60% of the pine acreage in the suitable land classification would be regenerated by clearcut and that 40% of the regeneration would be by the other even-aged methods of seedtree or shelterwood. Gov't Ex. 15, 1987 LRMP, at IV–15.

3. Pursuant to the Chief of the Forest Service's decision on remand of Plaintiffs' appeal of the 1987 LRMP, the determination of whether to utilize even-aged management in a timber sale is now made at the project level. *Sierra Club v. Espy,* 822 F.Supp. at 359 n. 5 (discussing the 1989 decision); Gov't Ex. 243A, 1996 LRMP, at 9.

4. Even-aged management diminishes many of the plant and animal species native to the National Forests in Texas, and some plant and animal species may be irretrievably lost. R. 123/16 to 124/7, 254/9 to 261/3, 268/13 to 274/13, 456/4–24, 462/8–16, 656/10–

11, 672/10 to 674/4, 1403/23 to 1404/6, 1582/5–14, 1608/21 to 1609/4.

5. The natural ecosystem of the National Forests in Texas contains mostly mixed forests of pine and hardwood. Gov't Ex. 19, 1992 Five Year Review, at 3–70, no. 1; Gov't Ex. 243A, 1996 LRMP, at 10.

6. The even-aged management practices maximize the production of southern pines (loblolly, shortleaf, and longleaf) and reduce hardwood tree species. R. 452/4–19, 456/4–24, 466/5 to 467/3, 656/7 to 658/9; Gov't Ex. 15, 1987 LRMP, at J–4 to J–11.

7. Under the 1987 LRMP, the even-aged management areas were, at times, referred to as "pine plantations." Gov't Ex. 15, 1987 LRMP, at IV–55.

8. Even-aged management is not permitted in certain areas of the National Forests in Texas. Commercial timber production of any kind is precluded on approximately 95,000 acres or 14.9% of the National Forests in Texas, e.g., wilderness and scenic areas. R. 754/7–11; Gov't Ex. 15, 1987 LRMP, at IV–11 to IV–12, Amendment 6 at 8.

9. The 1987 LRMP contemplated that even-aged management would be carried out on approximately 10% (63,840 acres) of the total National Forest land over ten years. Gov't Ex. 15, 1987 LRMP, at IV–53. But, since the approval of the 1987 LRMP, the Forest Service has actually carried out even-aged regeneration on approximately 3.8% of the total National Forest land. R. 766/23, 792/8.

10. In 1995, 0.2% of the National Forests in Texas were harvested using even-aged regeneration. R. 766/23. The breakdown for each prior year is: 1.2% in 1987; 1% in 1988; 0.3% in 1989; 0.4% in 1990; 0.2% in 1991; 0.2% in 1992; 0.2% in 1993; and 0.2% in 1994. R. 766/9–23.

11. The estimate of 3.8% does not account for salvage volume because salvage is in response to an unplanned and unexpected happening or event. R. & 05/1 to 807/24, 872/20–25. Salvage is not a part of even-aged management. *Id.* For illustrative purposes, however, the total acreage of timber subject to even-aged harvesting and salvage for the last nine years represents approximately 8% of the forested lands on the four National Forests. R. 767/20, 808/2–5.

12. This number rises to 9.5% when it is calculated for only those forested lands suitable for commercial timber harvest, thus excluding the approximately 95,000 acres of unsuitable area. R. 808/12 to 809/7.

13. The National Forests in Texas consist of uneven-aged forests made up of even-aged stands. R. 993/23–24, 1406/22–23, 1443/19 to 1444/14. Even-aged management across the forests creates a mosaic of tree stands of different ages, classes, and species mixes, thus providing for a mosaic of different habitats. *See, e.g.,* Gov't Exs. 236–37 (map and key demonstrating the mosaic of age-class distribution on the Angelina National Forest); Gov't Exs. 238–39 (map and key demonstrating the mosaic of forest type or species-class distribution on the Angelina National Forest).

14. To manage for diversity, the Forest Service tracks and provides for a diversity of habitats by collecting information on tree species. The Continuous Inventory of Stand Conditions database provides an overview of the age-class distribution for all National Forests in Texas. Gov't Ex. 95; R. 889/14 to 891/4.

15. There is controversy about what a "natural" forest is because ecological systems are dynamic and change through time. R. 311/5–15, 1547/1–11.

16. There is general consensus among plant ecologists, however, to use close to pre-European settlement of North America as a reference point for what is "natural" because it is the first point in time in which there are a variety of lines of evidence from which ecologists can reconstruct vegetation patterns. R. 1547/16–24.

17. A variety of factors determined what the pre-European settlement or "natural" forest looked like. In addition to landscape location and physical variables such as nearness to water or soil texture and fertility, disturbances had an important influence in shaping the composition and structure of forests throughout the Southeast. R. 1555/3–12.

18. A "disturbance" is an event or occurrence that abruptly disrupts the forest structure and process. A disturbance can be

caused naturally or by man. R. 1556/7–13. Just as forests were variable on the landscape, the disturbance regimes found in these forests also varied. And, the structure and composition of the forests influenced the disturbance regime. R. 1557/15–22. Disturbances that contributed to the pre-European or "natural" forest were fire and wind events, impacts of insects and disease, and flooding. R. 1555/13 to 1556/3, 1650/3 to 1657/2, 1659/21 to 1663/8.

19. Some evidence shows that, under natural circumstances, East Texas may have been an uneven-aged forest made up of even-aged patches caused by disturbances. R. 993/23 to 994/1, 1569/6–14, 1605/12 to 1606/5 (literature has mixed information).

20. Even-aged management introduces a variety of disturbances. R. 1556/17–18.

21. The disturbances created by even-aged management are similar to fire and wind disturbances in some ways. With the exception of site preparation activities, harvesting by an even-aged method results in openings in the canopy somewhat similar to that which occurs naturally through wind events. R. 1570/8–21. The two are dissimilar in that canopy openings that occur from wind events will vary widely in size and distribution over the forest, while canopy openings that occur as a result of even-aged harvesting will be generally even-sized and evenly distributed over the forest landscape. On average, the openings created by even-aged harvesting will be approximately 30 acres, which is within the range of natural disturbances. R. 1570/21 to 1572/11.

22. Even-aged management, if uniformly applied, produces fairly moderate-size habitat patches distributed across the landscape. R. 1576/18 to 1582/10; Gov't Ex. 236, 237 (map showing patches of age-class as distributed over the Angelina National Forest).

23. Three groups of organisms are adversely impacted by the characteristics of an even-aged managed forest: (1) species dependent on large patches of interior forests; (2) species dependent upon characteristics of old forests; and (3) species that cannot tolerate the change in stand conditions at the micro-level such as change in temperature or sunlight. R. 1584/3 to 1885/15.

24. Species such as neotropical migrants, which depend on larger, uninterrupted older forest, are provided for in the National Forests in Texas because there are large areas of the forest not dedicated specifically to even-aged management, e.g., wilderness areas, scenic areas, and other special management or interest areas. These areas will continue to be old forest and are dispersed across the forests in a way that provides required habitat for organisms like neotropical migrants. In addition, even within areas that are designated as general forest management areas (where even-aged management may occur), there are fairly large pieces of bottomland hardwood forest that remain uncut and fairly intact habitats for neotropical migrants (R. 1586/16 to 1587/24) and a significant amount of large, older even-aged stands necessary to the birds' survival (R. 1401/19 to 1402/11).

*Conclusions of Law and Analysis*

Section 1604(g)(3)(B) of the NFMA provides:

(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans. As soon as practicable, . . . the Secretary shall . . . promulgate regulations, under the principles of the Multiple–Use Sustained–Yield Act of 1960, that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to—

\* \* \* \* \* \*

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

\* \* \* \* \* \*

(B) provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to

the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan....

16 U.S.C. § 1604(g)(3)(B). The "multiple-use objectives" are set forth in the Multiple–Use Sustained–Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528–31. MUSYA requires (1) that the National Forests be managed for the "multiple use" of various renewable resources, including "recreation, range, timber, watershed, and wildlife and fish," and (2) that the "periodic output" of such resources be maintained "in perpetuity ... without impairment of the productivity of the land." 16 U.S.C. §§ 528, 529, 531. MUSYA recognizes that "some land will be used for less than all of the resources." 16 U.S.C. § 531(a).

After extensively reviewing the legislative history of the NFMA and regulations, Wilkinson and Anderson conclude:

> [S]ection 6(g)(3)(B) has three complementary meanings in the context of timber planning. First, it is a general mandate to bring timber production into balance with wildlife and ecological values. Second, it limits the use of forest conversions to cases where the conversion can be justified by its benefit to nontimber resources. Third, it prohibits monoculture. These three elements, when taken together, require the Forest Service to look at the forest as an ecological whole and to ensure that, over time, the forest is not converted into a "tree farm."

WILKINSON & ANDERSON, supra, at 173.

The NFMA requires that the Secretary of Agriculture promulgate regulations that provide for diversity. The Secretary promulgated two sections related to diversity: 36 C.F.R. §§ 219.26, 219.27(a)(5), (g). Section 219.26 provides:

> Forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition. For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource out-

puts and uses, including proposed management practices. (Refer to § 219.27(g).)

36 C.F.R. § 219.26. Section 219.27 provides in part:

> The minimum specific management requirements to be met in accomplishing goals and objectives for the National Forest System are set forth in this section. These requirements guide the development, analysis, approval, implementation, monitoring and evaluation of forest plans.
> (a) *Resource protection.* All management prescriptions shall,—
>
> * * * * * *
>
> (5) Provide for and maintain diversity of plant and animal communities to meet overall multiple-use objectives, as provided in paragraph (g) of this section;
>
> * * * * * *
>
> (g) *Diversity.* Management prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities, including endemic and desirable naturalized plant and animal species, so that it is at least as great as that which would be expected in a natural forest and the diversity of tree species similar to that existing in the planning area. Reductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives. Planned type conversion shall be justified by an analysis showing biological, economic, social, and environmental design consequences, and the relation of such conversions to the process of natural change.

36 C.F.R. § 219.27(a)(5), (g) (emphasis in original).

The Committee of Scientists, appointed by the Secretary of Agriculture, provided advice on the regulations. 16 U.S.C. § 1604(h); *see also* WILKINSON & ANDERSON, *supra* at 43–44 (explaining the work of the Committee of Scientists). With respect to diversity, the Committee of Scientists stated that the NFMA regulations " 'should go beyond a narrow and limited restatement of the lan-

guage of the [NFMA] to assure that the Forest Service shall indeed "provide for" diversity by maintaining and preserving existing variety.'" WILKINSON & ANDERSON, *supra,* at 194–95 (quoting *Final Report of the Committee of Scientists,* 44 Fed.Reg. 26,609 (1979)). "Reductions in diversity—such as forest type conversions—are permitted only where needed to meet overall multiple-use objectives and must be justified by an elaborate analysis of potential consequences." WILKINSON & ANDERSON, *supra,* at 195. "[T]he NFMA regulations require Forest Service planners to deal with diversity on a comprehensive basis, rather than limiting their focus to the issue of forest conversion and monoculture. Planners must ensure that the essential ecological components of each national forest are adequately protected." *Id.*

 The Committee of Scientists, however, ultimately concluded that it was impossible to write *specific* regulations that would provide for diversity. The Committee of Scientists stated:

> Provision for "diversity" as required by NFMA is one of the most perplexing issues dealt with in the draft regulations. We believe it is impossible to write specific regulations to "provide for" diversity.

44 Fed.Reg. 26,600–01. "Although the statement of policy [to provide for diversity] is clear, there remains a great deal of room for honest debate on the translation of policy into management planning requirements and into management programs." *Id.* at 26,608. Section 219.3 broadly defines "diversity" as "[t]he distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3. But the regulations do not dictate that the Forest Service analyze diversity in any specific way, and courts defer to the Forest Service's method of diversity unless it is irrational. *See Sierra Club v. Marita,* 46 F.3d at 621. "[I]t is difficult to discern any concrete legal standards on the face of [section 1604(g)(3)(B) ]." WILKINSON & ANDERSON, *supra,* at 296. While acknowl-·edging the debate over the precise meaning

of "diversity," the Fifth Circuit has not defined the "outer boundaries" of the NFMA's protection and diversity requirements. *Sierra Club v. Espy,* 38 F.3d at 801.

 The Forest Service's even-aged management practices may be diminishing "diversity," particularly at the "alpha" level.[9] Documentary evidence and testimony at trial, including some from the Federal Defendants' witnesses, showed that even-aged management, as practiced by the Forest Service in the National Forests in Texas, substantially alters plant and animal habitat as well as creates monocultures of pine trees. The plant and animal habitat is altered when even-aged management practices remove the protective forest canopy and expose the forest floor to sunlight. Even-aged management also involves site preparation activities such as shearing and piling of vegetation from the forest floor. When the canopy is removed, plant and animal life that depends on the canopy is diminished. Once an area is harvested under even-aged management, pine trees are regenerated, often removing any competing hardwoods. The Forest Service has referred to these areas as "pine plantations."

Defendants argue that despite the loss of some species of plants and animals under even-aged management, those species are replaced by different species under the even-aged forest habitat. Defendants further argue that even though a species may be eradicated from a particular management area, other areas of the forest (*e.g.,* wilderness and scenic) provide sufficient habitat for species that cannot survive even-aged management practices. For example, although a Forest Service scientist testified that some bird species would not survive in the mosaic of even-aged stands, other areas of the forest would provide sufficient habitat for the species.

With respect to the pine monocultures, the Federal Defendants presented some evidence that the "natural" forest may have been an uneven-aged forest made up of even-aged patches. Defendants argue that the Forest Service's even-aged management activities

---

**9.** "Alpha diversity" is diversity within a stand while "beta diversity" is diversity between stands. *Sierra Club v. Robertson,* 784 F.Supp. 593, 611 (W.D.Ark.1991), *aff'd,* 28 F.3d 753 (8th Cir.1994).

are designed to mimic the natural processes of pre-European settlement forests. The Forest Service justifies the use of fire and other methods (*e.g.*, herbicides) to remove hardwoods by claiming that these practices are similar to the frequency of fire in the natural, pre-European settlement forest. The Forest Service's hypothesis that the Texas forests were predominantly pine in their natural state, however, is undermined by their regular practice of having to eradicate hardwoods and other plant life that naturally compete with the pine trees shortly after harvesting and regeneration. This practice must be to meet other multiple-use objectives such as timber production. *See* 16 U.S.C. § 1604(g)(3)(B).

The Forest Service's even-aged management practices are drastically reducing plant and animal species in some areas of the forest and creating areas of pine monoculture. But, the court cannot conclude that the Forest Service's actions are irrational or otherwise arbitrary and capricious. The regulations do not dictate that the Forest Service analyze diversity in any specific way. Additionally, the court is required to look at diversity over the entire planning area (here the four National Forests in Texas) rather than within an area of monoculture. *See* 36 C.F.R. § 219.3.[10] Therefore, under (1) the APA's deferential standard of review, (2) the deference to the Forest Service's expertise, and (3) the ambiguous NFMA statute and regulations on diversity, the court determines that, on the evidentiary record in this case, the Federal Defendants have not violated section 1604(g)(3)(B) of the NFMA or sections 219.26 and 219.27(a)(5) and (g) of the regulations. This determination with respect

to diversity, however, does not address the issue of adequate monitoring under section 219.26.

## PROTECTING KEY RESOURCES

*Primary Legal Standards Governing Protection of Key Resources*

Section 1604(g)(3)(F)(v) of the NFMA provides:

(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans. As soon as practicable, ... the Secretary shall ... promulgate regulations, under the principles of the Multiple–Use Sustained–Yield Act of 1960, that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to—

\* \* \* \* \* \*

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

\* \* \* \* \* \*

(F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an evenaged stand of timber will be used as a cutting method on National Forest System lands only where—

\* \* \* \* \* \*

(v) such cuts are carried out in a manner consistent with the protection of soil,

---

10. There is some tension between sections 219.3 and 219.19. Section 219.3 requires an evaluation of "diversity" in terms of the entire planning area (here the four National Forests in Texas). But, section 219.19 requires: "Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.... [A] viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is *well distributed in the planning area*." 36 C.F.R. § 219.19 (emphasis added). The regulatory history of section 219.19 indicates that the Forest Service must maintain the existing species

distribution throughout each National Forest. Wilkinson and Anderson explain: "[W]hile plans can result in habitat conditions that reduce a species' *density*, the plans must allow that species ... maintain its existing *distribution*." WILKINSON & ANDERSON, *supra* at 298–99 (citing FOREST SERVICE AND PANEL OF CONSULTANTS ON PROPOSED REVISION OF NFMA REGULATIONS, SUMMARY REPORT 4 (June 30–July 2, 1982)) (emphasis in original). Thus, it may be permissible for the Forest Service to displace species from certain monoculture areas into other locations in the "planning area" under the definition of "diversity" in section 219.3. But, in doing so, the Forest Service may be afoul of section 219.19's requirement that the species be "well distributed in the planning area."

watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

16 U.S.C. § 1604(g)(3)(F)(v).[11]

In interpreting the NFMA and regulations on protection of key resources, the Fifth Circuit has stated:

The directive that national forests are subject to multiple uses, including timber uses, suggests that the mix of forest resources will change according to a given use. Maintenance of a pristine environment where no species' numbers are threatened runs counter to the notion that NFMA contemplates both even- and uneven-aged timber management. Indeed, NFMA regulations anticipate the possibility of change and provide that "[r]eductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives." 36 C.F.R. § 219.27(g); see also 16 U.S.C. § 1604(g)(3)(C) (LRMP must ensure research and evaluation of effects of each management system to assure no "substantial and permanent impairment" of land productivity) (emphasis added); 16 U.S.C. § 1604(g)(3)(E)(i) (LRMP must provide that timber be harvested only where "soil, slope, or other watershed conditions will not be irreversibly damaged") (emphasis added). That protection means something less than preservation of the status quo but something more than eradication of species suggests that this is just the type of policy-oriented decision Congress wisely left to the discretion of the experts—here, the Forest Service.

Sierra Club v. Espy, 38 F.3d at 800. The Fifth Circuit, however, warned:

The Forest Service's discretion, however, is not unbridled. The regulations implementing NFMA provide a minimum level of protection by mandating that the Forest Service manage fish and wildlife habitats to insure viable populations of species in planning areas. 36 C.F.R. § 219.19.

Id. at 800–01.

*Soil*

Findings of Fact

■ 1. The Forest Service's timber harvesting practices are causing substantial and permanent soil erosion on the National Forests in Texas. Pls.' Exs. 1–3, 5, 80–83, 102, 108, 173, 175–82, 210–16, 249–50, 308–11, 318, 358, 386, 551–52, 650x (soil erosion study); Gov't Ex. 42, at 27–33; R. 120/14 to 121/5, 338/8 to 342/16, 347/10 to 348/14, 349/3 to 350/18, 358/10 to 359/8, 609/2–24. The Forest Service has failed to conserve the soil resource during its management.

2. The Forest Service's timber harvesting practices are eroding nutrient-rich soil from the forest land. R. 346/5 to 348/14. The eroded soil fills in pools and is deposited in streams and gullies. *Id.*

3. The erosion is carving channels or gullies from a few inches deep to several feet deep. R. 340/13–16, 348/20–21, 349/22–24; Pls.' Ex. 650x. When run-off of water and soil from a timber harvest site reaches

---

11. Section 219.27(c)(6) of the regulations practically mirrors the statutory requirement:

The minimum specific management requirements to be met in accomplishing goals and objectives for the National Forest System are set forth in this section. These requirements guide the development, analysis, approval, implementation, monitoring and evaluation of forest plans.

\* \* \* \* \* \*

(c) *Silvicultural practices.* The following management requirements apply to timber harvest and cultural treatments:

\* \* \* \* \* \*

(6) Timber harvest cuts designed to regenerate an even-aged stand of timber shall be carried out in a manner consistent with the protection of soil, watershed, fish and wildlife, recreation, and aesthetic resources, and the regeneration of the timber resource.

36 C.F.R. § 219.27(c)(6).

streams it changes their character by making them wider and shallower and by altering the stream's water flow. R. 355/1-5.

4. An even-aged management site, as managed by the Forest Service, produces increased run-off of water and soil for thirteen years before a return to normal run-off levels. This return to normal run-off occurs only after the nutrient-rich soil has been irreversibly displaced off the forest land. R. 346/15-21.

5. The Forest Service does not require post-harvest restoration of some areas affected by and contributing to erosion. R. 1230/14 to 1231/4.

6. In addition to eroding soil from the forest land, Forest Service management practices are substantially and permanently reducing organic and other essential matter in the forest soils.

7. The productivity of soil is dependent on the presence of nitrogen, a primary nutrient supporting the plant and animal life in the forests. R. 407/4-18, 1264/9-12.

8. Nitrogen exists in the organic matter present in soil; both nitrogen and organic matter are essential for the long term productivity of the soil. R. 407/4-18.

9. Even-aged management causes loss of nitrate (a form of nitrogen), through run-off from timber harvest sites for twenty years and longer. R. 420/10-18.

10. Soil is replenished with nutrients that are formed from the decomposition of root systems, leaf litter, coarse woody debris, and other natural matter on the forest floor. R. 464/19-25, 548/2-4, 550/10-21.

11. The biologically active portion of the forest floor consists of the following: the litter (or topmost layer, comprised of leaves and large pieces of plant matter); the duff layer (organic matter in a more advanced state of decomposition than the litter layer); and the humus layer (most commonly known as soil, which is divided for descriptive purposes into the A-horizon (topmost) and the B-horizon). The duff layer exists above the A-horizon of the soil. R. 522/9-17, 538/7-9.

12. Fungi, bacteria, insects and nematodes, duff, and humus return essential nutrients to the soil system. R. 523/9-16, 537/3-25. Organic matter in the soil is essential to forest health. R. 1074/13-19.

13. Ectomycorrhizae, a type of fungus present in the biologically active portion of soil, exist in symbiosis with trees and are essential for providing trees with phosphorous, nitrogen, and water. R. 408/13 to 409/18.

14. Studies of the effects of even-aged management on essential fungi and bacteria in soil have documented that five years after an even-aged timber harvest, only one percent of essential fungi and bacteria remain in the soil. R. 407/19 to 408/9.

15. Removal of the litter, duff, and humus layer decreases the productivity of the soil because the decomposition of natural matter no longer provides essential nutrients to the soil. R. 402/2-25, 404/1 to 405/23.

16. The sudden growth of vegetation after clearcutting does not indicate the maintenance of soil fertility but rather a significantly increased decomposition and loss of organic matter from soil. R. 1729/25 to 1730/15.

17. Even-aged management, as practiced by the Forest Service in the National Forests in Texas, results in the removal of all above-ground woody vegetation, R. 406/8-21, 550/6-21, 912/15-22.

18. There has been a significant decrease in the litter, duff, and humus layers resulting from even-aged management practices in Compartment 98 of the Sam Houston National Forest. R. 411/23 to 415/18, 536/7-21.

19. The Forest Service does not observe, measure, inventory, or monitor the organic content of soil during the course of their management activities in the National Forests in Texas. R. 936/3-14, 1083/14-24, 1197/13-15, 1199/16-20.

20. The reduction of the organic content of soil, caused by the Forest Service's even-aged management practices, is noticeable in twenty to thirty year old pine stands in the National Forests in Texas. R. 530/17-23.

21. The Forest Service's timber harvesting practices are causing substantial and permanent damage to the essential, organic matter in the soil. Once lost, the organic matter

does not return for hundreds of years, and, in some instances, thousands of years. R. 536/7–21.

22. Forest Service management practices are causing irreversible damage to the soil resource.

Conclusions of Law and Analysis

In even-aged timber harvesting, the Forest Service must protect the soil resource. 16 U.S.C. § 1604(g)(3)(F)(v); 36 C.F.R. § 219.27(c)(6). Management plans must "insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land." 16 U.S.C. § 1604(g)(3)(C); see also § 1604(g)(2)(B) (requiring collection of "inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids"). Management plans also must "insure that timber will be harvested from National Forest System lands only—where (i) soil, slope, or other watershed conditions will not be irreversibly damaged...." 16 U.S.C. § 1604(g)(3)(E)(i). In this section, Congress intended that the Forest Service "provide empirical guarantees that timber harvesting will not damage soils, water conditions, and fish habitats." WILKINSON & ANDERSON, supra at 161.

The NFMA regulations require "conservation" of soil and water. Section 219.27(a)(1) provides that "[a]ll management prescriptions shall—(1) [c]onserve soil and water resources and not allow significant or permanent impairment of the productivity of the land...." Section 219.27(b)(5) provides that "[m]anagement prescriptions that involve vegetative manipulation of tree cover for any purpose shall—(5) [a]void permanent impairment of site productivity and ensure conservation of soil and water resources...." "Conservation of soil and water resources involves the analysis, protection, enhancement, treatment, and evaluation of soil and water resources and their responses under management and shall be guided by instructions in official technical handbooks." 36 C.F.R. § 219.27(f).

■ The Forest Service is neither protecting nor conserving the key resource of soil. Forest Service management practices, which have been primarily even-aged, are causing severe erosion of soil from the forest landscape and related loss of organic matter. This soil loss is substantially and permanently impairing the productivity of the forest land and possibly timber production. The evidence at trial did not indicate which of the particular even-aged management practices was the primary cause of the severe soil erosion and derogation of the organic matter in the soil. The possible causes are numerous, including: poor site selection, excessive rutting and compaction, cutting within streamside management zones, harvesting during poor soil conditions, intensive site preparation, eradication of hardwood trees from a site, and failure to restore damaged areas. In determining whether the Forest Service is in violation of the NFMA and regulations, the focus is on whether the soil resource is ultimately being protected rather than which of the even-aged practices is causing harm to the soil. The efficacy of particular even-aged management practices is within the discretion of the Forest Service so long as the soil resource remains protected.

Whatever Forest Service planning documents prescribe with respect to protection of soil, the evidence shows that, on-the-ground, the Forest Service is not protecting the soil resource. The Forest Service has stepped outside its discretion and acted arbitrarily and capriciously by failing to conduct its management activities in a way that prevents severe soil erosion. Accordingly, the court determines that Federal Defendants have violated sections 1604(g)(3)(E)(i) and (g)(3)(F)(v) of the NFMA and sections 219.27(a)(1), (b)(5), (c)(6), and (f) of the regulations. This determination with respect to soil, however, does not address the issue of adequate monitoring of the soil resource.

*Watershed*

Findings of Fact

■ 1. The court's findings of fact on the soil resource issue are incorporated herein.

2. The National Forests in Texas lie within the watersheds of five of Texas's major

rivers: Angelina, Neches, Trinity, San Jacinto, and Sabine. R. 854/8 to 855/9.

3. Major water bodies such as Lake Livingston, Lake Conroe, Sam Rayburn Reservoir, and Toledo Bend Reservoir share boundaries with the National Forests in Texas. R. 854/8–25, 855/1–9.

4. The Forest Service classifies the streams running through the National Forests in Texas as perennial, intermittent, and ephemeral. Gov't Ex. 15, 1987 LRMP, at IV–35, IV–87.

5. The Forest Service's management prescriptions afford streams and associated riparian areas certain protection from the effects of timber harvesting. Gov't Ex. 15, 1987 LRMP, at IV–35, IV–87; Gov't Ex. 243A, 1996 LRMP, at 158–60.

6. Under the 1987 LRMP, management prescriptions for perennial streams required a stringer (an area directly adjacent to a stream course) of one hundred feet on either side of the stream. Intermittent streams required a stringer of sixty-six feet. The purpose of stringers is to provide " 'pockets' of vegetation that will remain free from silvicultural manipulation for fiber production." Gov't Ex. 15, 1987 LRMP, at IV–87 to IV–88. Under the 1996 LRMP, streamside management zones are protected from timber production. The streamside management zone consists of a fifty-foot "primary zone" and a "secondary zone" extending from the "primary zone" to a distance designated by the Forest Service on a case-by-case basis. Skidders and other logging equipment are not permitted in the "primary zone." Gov't Ex. 243A, 1996 LRMP, at 152, 158.

7. The Forest Service's standards and guidelines require it to protect stream courses by preventing logging debris from entering or remaining in stream courses during timber harvesting and by limiting the use of tracked and wheeled equipment in stringer areas. R. 1111/22–25; Gov't Ex. 15, 1987 LRMP; at IV–61, IV–89; Gov't Ex. 243A, 1996 LRMP, at 158–59.

8. On-the-ground, however, the Forest Service permits logging for timber production purposes right up to the stream banks throughout the National Forests in Texas. Pls.' Exs. 4, 17, 46, 105–06, 218, 244–46, 309, 650x, photograph nos. 47–48; R. 29/12–21,

164/6–15. For example, logging within streamside management zones has occurred on: Nebletts Creek (R. 72/1–21, 76/9 to 78/6); Little Lake Creek (R. 73/23 to 75/6); Jayhawker Creek (R. 75/9–25); Miller Creek (R. 78/8–19); Peach Creek (R. 171/12–24; Pls.' Ex. 83); and Clark's Creek (R. 179/12–17).

9. Logging operations and use of heavy equipment within stream course zones is causing erosion, compaction, and rutting. R. 608/6 to 615/9, 629/4–8, 1122/12 to 1133/13.

10. Forest Service management practices have blocked streams with tree stumps, slash, and other logging debris. Pls.' Exs. 4–6, 16, 244–45, 569, 581 (videotape), 650x; R. 83/12 to 84/2, 163/21 to 164/14, 698/14–22.

11. Logging operations within streamside management zones have substantially and permanently affected water and watersheds in the National Forests in Texas. R. 78/8–23, 628/12 to 631/14, 697/17 to 698/5; Pls.' Exs. 244–46. For example, the Forest Service has failed to protect water resources in the Angelina, Sabine, and Davy Crockett National Forests. Pls.' Ex. 650x; R. 609/19 to 610/2.

12. Forest Service management practices have caused substantial and permanent soil erosion and sediment deposit in streams and waterways. The depositing of soil and sediment in streams and waterways has degraded water quality and killed fish. R. 163/11 to 164/15, 171/12–24, 224/1–11, 609/1–24 (a 300-foot gully eroding into a riparian area), 664/10 to 665/2, 1367/5 to 1368/22; Pls.' Exs. 16, 83, 569; Gov't Ex. 15, 1987 LRMP, at J–28.

13. The Sabine Shiner and Scaly Sand Darter, which both require clear and sandy streams, are declining in population on the National Forests in Texas. R. 1367/5 to 1371/17. The Forest Service believes that siltation may be the cause. R. 1370/17–19. In response to these declines, the Forest Service advised its staff to concentrate on preventing siltation and erosion. R. 1367/24 to 1368/22; Gov't Ex. 64.

14. Cutting vegetation in a streamside zone removes the shade cover from the stream thereby raising the water temperature of the stream and changing the chemical

composition of the stream. Gov't Ex. 15, 1987 LRMP, J–28.

15. Water runs with increasing velocity away from an even-aged site toward surface water bodies like streams, carrying large quantities of the topsoil of the A-horizon and the nutrients contained therein. R. 120/14 to 121/5, 339/8 to 349/9, 609/2–23.

16. Substantial and permanent erosion of the soil's A-horizon into surface water in the National Forests in Texas is occurring, which changes the chemical composition of the stream. R. 121/5, 339/8 to 349/9, 609/2–23; Pls.' Exs. 175–76, 180–81.

18. Reviewing the testimony and exhibits regarding the Sam Houston, Angelina, Sabine, and Davy Crockett National Forests, the court finds that it has a representative and comprehensive picture of the Forest Service's management practices related to the protection of watersheds.

19. Forest Service management practices are causing irreversible damage to the watershed resource.

Conclusions of Law and Analysis

In harvesting timber, the Forest Service must protect and conserve the watershed resource. 16 U.S.C. § 1604(g)(2)(B), (g)(3)(C), (g)(3)(E)(i), (g)(3)(E)(iii), (g)(3)(F)(v); 36 C.F.R. § 219.27(a)(1), (a)(4), (b)(5), (c)(6), (e), (f) (as discussed in the conclusions of law section on the soil resource). "[P]rotection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperature, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat." 16 U.S.C. § 1604(g)(3)(E)(iii). "All management prescriptions shall ... [p]rotect streams, streambanks, shorelines, lakes, wetlands, and other bodies of water as provided under paragraph[ ] ... (e) of this section...." 36 C.F.R. § 219.27(a)(4). Paragraph (e) of section 219.27 provides:

*Riparian areas.* Special attention shall be given to land and vegetation for approximately 100 feet from the edges of all perennial streams, lakes, and other bodies of water. This area shall correspond to at least the recognizable area dominated by the riparian vegetation. No management

practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediment shall be permitted within these areas which seriously and adversely affect water conditions or fish habitat. Topography, vegetation type, soil, climatic conditions, management objectives, and other factors shall be considered in determining what management practices may be performed within these areas or the constraints to be placed upon their performance.

36 C.F.R. § 219.27(e). Watershed protection involves managing the forest in a manner that: (1) prevents erosion, (2) provides for a steady flow of water run-off, (3) prevents silt and sedimentation in streams and waterways, and (4) protects fish and wildlife. *See* WILKINSON & ANDERSON, supra at 201–07. "Taken together, the NFMA water quality provisions require strong measures to protect water resources and fish habitats from detrimental impacts of timber harvesting and road construction." *Id.* at 223.

The Forest Service is neither protecting nor conserving the key resource of watershed. Forest Service management practices, which have been primarily even-aged, are causing substantial and permanent (1) erosion within waterways, (2) deposit of soil, silt, and sedimentation in waterways, and (3) disruption of water run-off. This derogation of the watershed resource is substantially and permanently impairing the productivity of the forest land. As determined in the previous section on the soil resource, the Forest Service's timber harvesting activities are causing severe soil erosion from the forest land. This soil erosion in turn is adversely affecting the waterways that are an integral part of the watershed resource. First, excessive run-off from timber-harvest sites causes erosion and scouring of streams. The evidence at trial indicated that some of the streams in the National Forests in Texas have been eroded away or "blown-out" by excessive water run-off. Second, the erosion and displacement of soil from timber-harvest sites are filling in streams or otherwise causing severe siltation and sedimentation. Siltation and sedimentation detrimentally changes the water's temperature and chemical compo-

sition. Third, once a stream is eroded away or filled in, water flow rates are adversely affected. For example, an increase in a water flow rate (1) contributes to the risk of flooding after a storm and (2) deprives the watercourse of a steady flow of water needed to support plant, fish, and other animal life.

The Forest Service's timber harvesting practices also are damaging the watershed resource by permitting (1) timber harvesting within streamside management zones and (2) blocking streams with tree stumps, slash, and other logging debris. The Forest Service's harvesting within streamside management zones is causing irreversible damage to the watershed resource.[12] First, excessive removal of vegetation around a stream exposes the soil to erosion in and surrounding the stream and its banks. Second, without vegetative cover, the stream itself is subjected to sunlight, which increases water temperature, changes the chemical composition, and destroys fish habitat. Third, timber harvesting within the streamside zone deposits tree stumps, slash, and other logging debris in the streams.[13] Blockage of the streams disrupts steady, water flow run-off.

Whatever Forest Service planning documents prescribe with respect to protection of watershed, the evidence shows that, on-the-ground, the Forest Service is not protecting or conserving the watershed resource. The Forest Service has stepped outside its discretion and acted arbitrarily and capriciously. Accordingly, the court determines that Federal Defendants have violated sections 1604(g)(3)(E)(i), (g)(3)(E)(iii), and (g)(3)(F)(v) of the NFMA and sections 219.27(a)(1),

(a)(4), (b)(5), (c)(6), (e), and (f) of the regulations. This determination with respect to watershed, however, does not address the issue of adequate monitoring of the watershed resource.

*Fish and Wildlife*

█ In even-aged timber harvesting, the Forest Service must protect the fish and wildlife[14] resources. 16 U.S.C. § 1604(g)(3)(F)(v); 36 C.F.R. § 219.27(c)(6). Section 219.19 of the regulations provides:

Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19. With respect to the viable populations requirement, Wilkinson and Anderson explain: "[A] sufficient number of reproductive individuals of all existing vertebrate species must be maintained in order to ensure viable populations; [and] habitat for any particular species must be distributed throughout each national forest." WILKINSON & ANDERSON, *supra*, at 297. With re-

---

**12.** Under the Forest Service's interpretation, "special attention" in section 219.27(e) does not prohibit the Forest Service from cutting within a 100 feet of a perennial stream so long as the cutting is for a purpose other than timber production, *i.e.*, wildlife management. The Forest Service's interpretation of its own regulations will control if that interpretation is not " 'plainly erroneous or inconsistent with the regulations.' " *Robertson*, 490 U.S. at 359, 109 S.Ct. at 1850–51 (quoting *Bowles*, 325 U.S. at 414, 65 S.Ct. at 1217). The court determines that the Forest Service's interpretation is not plainly erroneous or inconsistent with the regulations if in fact that is its practice on-the-ground. The evidence at trial, however, demonstrated that, without a non-timber production reason, the Forest Service was cutting trees within streamside management zones or, in some cases, totally removing the

streamside management zone by removing every tree surrounding a stream.

**13.** The Forest Service presented some evidence that it monitored the logging operation on Compartment 98 of the Sam Houston National Forest with respect to discarding logging debris in streams. The overwhelming weight of the evidence at trial, however, was that logging debris was routinely left in streams throughout the National Forests in Texas.

**14.** Although "wildlife" could include all members of the animal kingdom living on the forest land, the NFMA and regulations focus primarily on vertebrate game and nongame species. *See* WILKINSON & ANDERSON, *supra*, at 273 (citing 36 C.F.R. § 219.19).

spect to the "well distributed" requirement, "while plans can result in habitat conditions that reduce a species' *density*, the plans must allow that species ... maintain its existing *distribution*." *Id.* at 298–99 (citing FOREST SERVICE AND PANEL OF CONSULTANTS ON PROPOSED REVISION OF NFMA REGULATIONS, SUMMARY REPORT 4 (June 30–July 2, 1982)) (emphasis in original). A well distribution of species guards against "species isolation" in which the viability of species is threatened because some of the species are isolated on an island of suitable habitat. WILKINSON & ANDERSON, *supra*, at 299.

The Plaintiffs have not carried their burden of showing that the Forest Service has failed to protect the fish and wildlife resources. The Plaintiffs did not produce sufficient evidence at trial that the Forest Service's timber harvesting activities are threatening viable populations of fish and wildlife. Although the Forest Service's timber harvesting activities are substantially and permanently affecting the watershed resource (which includes the component of fish habitat), the Plaintiffs did not offer evidence that in fact fish populations were threatened throughout the planning area. Accordingly, in connection with the fish and wildlife resources, the court determines that Federal Defendants have not violated section 1604(g)(3)(F)(v) of the NFMA or sections 219.27(c)(6) and 219.19 of the regulations. This determination with respect to protecting fish and wildlife, however, does not address the issue of adequate inventorying and monitoring.

*Recreation and Esthetic*

██ In even-aged timber harvesting, the Forest Service must protect the recreation and esthetic resources. 16 U.S.C. § 1604(g)(3)(F)(v); 36 C.F.R. § 219.27(c)(6). "Esthetic" is a variable of "aesthetic," which means "relating to the sense of the beautiful." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 82, 444 (1988). Section 219.21(f) of the regulations provides:

> To the degree consistent with needs and demands for all major resources, a broad spectrum of forest and rangeland related outdoor recreation opportunities shall be provided for in each alternative. Planning

activities to achieve this shall be in accordance with national and regional direction and procedural requirements of paragraphs (a) through (g) of this section.

\* \* \* \* \* \*

(f) The visual resource shall be inventoried and evaluated as an integrated part of evaluating alternatives in the forest planning process, addressing both the landscape's visual attractiveness and the public's visual expectation. Management prescriptions for definitive land areas of the forest shall include visual quality objectives.

36 C.F.R. § 219.21(f).

Plaintiffs have not carried their burden of showing that the Forest Service has failed to protect the recreation and esthetic resources. With respect to recreation, Plaintiffs offered evidence that they are unable to recreate in clearcut areas because of the dense, thorny vegetation. R. 35/6–15, 150/1–4. This evidence, however, does not indicate that Plaintiffs' recreational opportunities are substantially and permanently foreclosed by even-aged management. In fact, there was some evidence that clearcuts provide better recreational opportunities for hunters. Gov't Ex. 15, 1987 LRMP, at J–29. With respect to the esthetic resource, Plaintiffs offered evidence that clearcuts leave a scene of devastation on the forest landscape. Pls.' Exs. 1–2, 109–10, 133–35, 210–11,216–19; *see also* Gov't Ex. 15, 1987 LRMP, at J–29. The Plaintiffs, however, offered no evidence that the scene of devastation is permanent. With respect to section 219.21(f), the Forest Service presented evidence that it is inventorying the visual resource. R. 895/1–20. Accordingly, the court determines that Federal Defendants have not violated section 1604(g)(3)(F)(v) of the NFMA or sections 219.27(c)(6) and 219.21(f) of the regulations with respect to these resources.

*Timber*

██ In even-aged timber harvesting, the Forest Service must protect the timber resource. 16 U.S.C. § 1604(g)(3)(F)(v); 36 C.F.R. § 219.27(c)(6). The Forest Service's even-aged management practices *are often* designed to suppress hardwoods through the

use of intensive site preparation, herbicides, and prescribed burning. R. 839/19 to 840/6, 912/15–22; Gov't Ex. 2, at 1, 2–22, 27; Gov't Ex. 15, 1987 LRMP, at J–8 to J–9. Plaintiffs presented evidence that the suppression of hardwoods and the planting of non-native, pine monoculture increases the risk of insect damage to the trees. R. 447/3 to 448/11, 530/1–6, 546/8–18. Plaintiffs evidence, however, does not indicate that Forest Service management activities have actually caused substantial and permanent damage to the timber resource. Accordingly, the court determines that Federal Defendants have not violated section 1604(g)(3)(F)(v) of the NFMA or section 219.27(c)(6) of the regulations with respect to the timber resource.

It may seem anomalous that, on the one hand, the Forest Service has failed to protect the soil resource but that, on the other, Plaintiffs have not shown that the timber resource (which depends on the soil) has gone unprotected. These determinations are not in conflict. The court has determined that the Forest Service's even-aged management practices are causing severe erosion that has substantially and permanently damaged the soil resource. From this determination that the soil resource has been damaged through displacement and loss of organic matter, the court could draw a reasonable and highly probable inference that damage to the soil resource is causing damage to the timber resource, *i.e.,* loss of stand growth. In fact, Forest Service planning documents suggest that loss of stand growth will occur on those sites in which the soil has been displaced. *See, e.g.,* Gov't Ex. 52, Final Environmental Impact Statement: Vegetation Management in the Coastal Plain/Piedmont dated January 1989 ("1989 FEIS"), at IV–86 to IV–87 ("Growth losses of 20–50 percent have been measured in stands where 0.5–2.0 inches of topsoil had been removed before planting."). The court, however, is reticent to determine that the Forest Service is in violation of the NFMA without stronger evidence that damage to the soil resource is in fact causing loss of stand growth. On this evidentiary record, Plaintiffs have not made such a showing.

## INVENTORYING AND MONITORING

*Findings of Fact*

1. The court hereby incorporates all previously made findings of fact.

2. The Forest Service has not been inventorying or monitoring the populations or population trends of "management indicator species" ("MIS"), except the Red–Cockaded Woodpecker, Bald Eagle, major game species, and fish. R. 488/4 to 490/13, 651/17–25, 665/24 to 667/19, 1039/18–25, 1324/23 to 1326/18; Gov't Ex. 243A, Final Environmental Impact Statement dated 1996 ("1996 FEIS"), at App. F–1 to F–2.

3. To determine the effects of management activities, the Forest Service must select, inventory, and monitor the populations and population trends of MIS (as opposed to only maintaining habitat and assuming species are present). 36 C.F.R. § 219.19; R. 1383/15–22, 1389/20 to 1390/11, 1425/20 to 1426/10.

4. To maintain viable populations of existing native vertebrate species and ensure that those species are well distributed throughout the forest, a forest manager must set up a census program to determine the distribution and abundance of the particular species selected: R 325/15 to 326/4.

5. Under the 1987 LRMP, the Forest Service selected MIS. The aquatic MIS were: Largemouth Bass, Bluegill, Blackspot Shiner, Scaly Sand Darter, Longear Sunfish, Weed Shiner, and Dusky Darter. The forest land MIS were: White-tailed Deer, Bobwhite Quail, Eastern Bluebird, Six-lined Racerunner, Eastern Wild Turkey, Yellow Breasted Chat, Red–Cockaded Woodpecker, Pileated Woodpecker, and Eastern Gray Squirrel. Gov't Ex. 15, Final Environmental Impact Statement dated April 1987 ("1987 FEIS"), at D–2 to D–3; Gov't Ex. 15, 1987 LRMP, at IV–33 (incorporating the 1987 FEIS references to MIS).

6. Under the 1996 LRMP, the Forest Service has selected MIS and included them within a new category of indicators called "management indicators" ("MI"). These MI are: Red–Cockaded Woodpecker; Incised Groove Burr; Slender Gay Feather; Scarlet

Catchfly; Longleaf (Bluestem Series); Little Bluestem (Rayless Goldenrod Series); Navasota Ladies Tress; Yellow Fringeless Orchid; Spagnum (Beakrush Series); Nodding Nixie; Texas Bartonia; Sweetbay (Magnolia Series); Louisiana Squarehead; Shortleaf–Oak Forests; Loblolly–Oak Forests; Hardwood Forests; Southern Ladyslipper; Beech (White Oak Series); Bobwhite Quail (for Tallgrass Prairie); Little Bluestem (Indiangrass) (for Tallgrass Prairie); Neotropical Migrants (Yellow-throated Vireo, Wood Thrush, Acadian Flycatcher, and others); Neches River Rose Mallow; Bottomland Hardwood Forests; Snags; Whitetail Deer; Eastern Wild Turkey; Gray Squirrel; Fox Squirrel; Yellow Breasted Chat; Pileated Woodpecker; Largemouth Bass; Sunfish (Bluegill and Redear); Channel Catfish; Paddlefish; Scaly Sand Darter; Sabine Shiner; Dusky Darter; and Stonefly Guild. Gov't Ex. 243A, 1996 FEIS, at 103; Gov't Ex. 243A, 1996 LRMP, at 306–07.

7. The Texas Parks & Wildlife Department ("TPWD") collects population data on and monitors the Bald Eagle and major game species. The TPWD provides this data to the Forest Service in the form of a report. R. 134/5 to 138/19. The TPWD report does not enable the Forest Service to determine the effects of even-aged management on soil, watershed, fish, wildlife, recreation, esthetics, or timber. R. 139/15–22.

8. The Forest Service collects population data and tracks population trends on fish, including the aquatic MIS. R. 1346/9 to 1351/19, 1352/17–21, 1359/23 to 1363/16, 1367/5 to 1369/10, 1386/16 to 1389/16; Gov't Exs. 62, 65, 117, 122, 125, 126, 155, and 178. This inventorying and monitoring, however, is not complete or current for all areas of the National Forests in Texas. R. 653/22 to 654/15, 1351/14 to 1352/21, 1366/18–24, 1387/21 to 1389/6.

9. At trial and in its on-the-ground management, the Forest Service has taken the position that collection of population data on MIS is not "practical" because of the number of acres (approximately 670,000) the Forest Service is required to manage. R. 1314/21–25, 1325/12–14. Accordingly, the Forest Service does not collect population data on some MIS. The Forest Service instead: (1) provides habitat for the particular species, (2)

determines whether there is an "occurrence" of that species, and then (3) "assumes" that the population is sufficiently distributed. R. 1312/22 to 1316/15. For example, the Forest Service does not know the population of the Pileated Woodpecker, a MIS under the 1987 and 1996 LRMPs. R. 1083/3–13.

10. The Forest Service's planning documents, however, require collection of population data to inventory and monitor MIS.

11. The Forest Service's 1987 FEIS, which is referenced and incorporated by the 1987 LRMP's MIS provisions, states:

A final important requirement of the regulations is that population trends of the management indicator species will be monitored during implementation of the Forest Plan, and relationships to habitat changes determined. This then will become the feedback mechanism that will indicate the degree to which wildlife and fish goals are being met and whether or not adjustment of the Forest Plan is necessary.

Gov't Ex. 15, 1987 FEIS, at D–4; Gov't Ex. 15, 1987 LRMP, at IV–33.

12. The Forest Service's 1992 Five Year Review states:

A method that has received much attention by natural resource managers in recent years is computer simulation or modeling to predict the effects of certain management practices on wildlife. This technique has been developed for many areas managed by the [Forest Service]. The habitat capability concept, or HABCAP, is a computer generated model that utilizes habitat (Forest) management and condition to assess the capability of the Forest (habitat) to support certain species that require a specified and readily definable Forest type and age class.

* * *Important Note:* HABCAP does not or should not be used to derive wildlife target projections, populations, or estimates. Many other factors effect populations that are not considered within HABCAP. HABCAP merely serves to assess the potential for a specific population based on habitat availability in an area. The value of actual population monitoring for effectiveness or validation

of assumptions in land management cannot be stressed enough as to its importance in the overall [management indicator] process.

The HABCAP model is based on the Forest timber stand information (CISC) which exists for all managed stands.... On [the National Forests in Texas], some HABCAP values have been used that were developed on the Chatahoochee–Oconee. This information has limited reliability for east Texas.

Gov't Ex. 19, 1992 Five Year Review, at 2–80 (emphasis in original).

13. Noting the limitations of hypothetical models of habitat capability, the Forest Service's planning for the collection of population data of MIS is carried forward in the 1996 LRMP. Gov't Ex. 243A, 1996 LRMP, at 296, 300, 306–07, G–2. The 1996 LRMP provides: "Since the 1987 Plan, direct population monitoring has been limited to endangered and threatened species and major game species, through cooperation with the Texas Parks and Wildlife Department. Models have been developed for some management indicators to evaluate habitat on certain areas of the forest; *but these track capability rather than presence.*" Gov't Ex. 243A, 1996 FEIS, at F–1 to F–2 (emphasis supplied).

14. At least one of the models being used to assess habitat capability of MIS is HABCAP. Gov't Ex. 20, at 15–16; Gov't Ex. 21, at 37–38; Gov't Ex. 22, at 29–30. HABCAP detects trends in habitat capability but not populations or population trends. Gov't Ex. 22, at 29–30; Gov't Ex. 19, 1992 Five Year Review, at 2–80.

15. Because the Forest Service is not collecting population data for the MIS, the Forest Service cannot evaluate diversity, particularly in terms of animal and plant species.

16. The 1987 and 1996 LRMPs contemplate some site-specific collection of data for purposes of inventorying and monitoring. Gov't Ex. 15, 1987 LRMP, at IV–33; Gov't Ex. 243A, 1996 LRAMP, at 300.

17. The Forest Service is not adequately inventorying or monitoring: (1) populations of some wildlife MIS; (2) diversity in terms of its prior and present condition; and (3) its management activities as to whether it is

meeting objectives and adhering to management standards and guidelines.

18. The Forest Service's failure to adequately inventory and monitor may be causing permanent and substantial damage to the productivity of the land. Without adequate inventorying and monitoring, the Forest Service cannot determine the effects of its management activities on the forest resources.

*Conclusions of Law and Analysis*

The foundation of public land and resource planning is "gathering data in order to establish an inventory of commodity and noncommodity resources." WILKINSON & ANDERSON, *supra* at 10. While a LRMP (which allocates competing forest resources) is implemented, performance is monitored. *Id.* Sections 1604(g)(2)(B) and (g)(3)(C) of the NFMA provide:

(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans. As soon as practicable, ... the Secretary shall ... promulgate regulations, under the principles of the Multiple–Use Sustained–Yield Act of 1960, that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to—

\* \* \* \* \* \*

(2) specifying guidelines which—

\* \* \* \* \* \*

(B) provide for obtaining inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids....

\* \* \* \* \* \*

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

\* \* \* \* \* \*

(C) insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end

that it will not produce substantial and permanent impairment of the productivity of the land....

16 U.S.C. § 1604(g)(2)(B), (g)(3)(C).

Pursuant to the NFMA, the Secretary of Agriculture promulgated regulations that require inventorying and monitoring on the National Forests. Sections 219.12(d) and (k) of the regulations provide:

(d) *Inventory data and information collection.* Each Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction. The Supervisor will assure that the interdisciplinary team has access to the best available data. This may require that special inventories or studies be prepared. The interdisciplinary team shall collect, assemble, and use data, maps, graphic material, and explanatory aids, of a kind, character, and quality, and to the detail appropriate for the management decisions to be made. Data and information needs may vary as planning problems develop from identification of public issues, management concerns, and resource use and development opportunities. Data shall be stored for ready retrieval and comparison and periodically shall be evaluated for accuracy and effectiveness. The interdisciplinary team will use common data definitions and standards established by the Chief of the Forest Service to assure uniformity of information between all planning levels. As information is recorded, it shall be applied in any subsequent planning process. Information developed according to common data definitions and standards shall be used in the preparation of the 1990, and subsequent RPA Assessments and RPA Programs.

$$* \quad * \quad * \quad * \quad * \quad *$$

(k) *Monitoring and evaluation.* At intervals established in the plan, implementation shall be evaluated on a sample basis to determine how well objectives have been met and how closely management standards and guidelines have been applied.

Based upon this evaluation, the interdisciplinary team shall recommend to the Forest Supervisor such changes in management direction, revisions, or amendments to the forest plan as are deemed necessary. Monitoring requirements identified in the forest plan shall provide for—

(1) A quantitative estimate of performance comparing outputs and services with those projected by the forest plan;

(2) Documentation of the measured prescriptions and effects, including significant changes in productivity of the land; and

(3) Documentation of costs associated with carrying out the planned management prescriptions as compared with costs estimated in the forest plan.

(4) A description of the following monitoring activities:

(i) The actions, effects, or resources to be measured, and the frequency of measurements;

(ii) Expected precision and reliability of the monitoring process; and

(iii) The time when evaluation will be reported.

(5) A determination of compliance with the following standards:

(i) Lands are adequately restocked as specified in the forest plan; [15]

(ii) Lands identified as not suited for timber production are examined at least every 10 years to determine if they have become suited; and that, if determined suited, such lands are returned to timber production;

(iii) Maximum size limits for harvest areas are evaluated to determine whether such size limits should be continued; and

(iv) Destructive insects and disease organisms do not increase to potentially damaging levels following management activities.

36 C.F.R. § 219.12(d), (k). "[F]orest plan[s] shall contain ... [m]onitoring and evaluation

---

**15.** "When trees are cut to achieve timber production objectives, the cuttings shall be made in such a way as to assure that the technology and knowledge exists to adequately restock the lands within 5 years after final harvest. Research and experience shall be the basis for determining whether the harvest and regeneration practices planned can be expected to result in adequate restocking." 36 C.F.R. § 219.27(c)(3).

requirements that will provide a basis for a periodic determination and evaluation of the effects of management practices." 36 C.F.R. § 219.11(d). In conducting inventorying and monitoring, the Forest Service is required to continually identify research needs:

Research needs for management of the National Forest System shall be identified during planning and periodically reviewed during evaluation of implemented plans. Particular attention should be given to research needs identified during the monitoring and evaluation described in § 219.12(k). These identified needs shall be included in formulating overall research programs and plans which involve private as well as public forest and rangelands.

36 C.F.R. § 219.28(a); *see also Oregon Natural Resources Council v. Lowe,* 836 F.Supp. 727, 734 (D.Or.1993) ("The regulations contemplate that [the Forest Service] would continue to conduct research and update inventories."), *aff'd,* 109 F.3d 521 (9th Cir.1997).

The dominant method of inventorying and monitoring the forest resources is selecting, inventorying, and monitoring MIS. The viability of fish and wildlife on the forest land is a sound indicator of not only the health of all animal and plant life in the forest but the availability of all forest resources. Sections 219.19(a)(1), (a)(2), (a)(5), and (a)(6) of the regulations provide:

Fish and wildlife habitat shall be managed to maintain cable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

(a) Each alternative shall establish objectives for the maintenance and improvement of habitat for management indicator species selected under paragraph (g)(1) [read as (a)(1)] of this section, to the degree consistent with overall multiple use

objectives of the alternative. To meet this goal, management planning for the fish and wildlife resource shall meet the requirements set forth in paragraphs (a)(1) through (a)(7) of this section.

(1) In order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection will be stated. These species shall be selected because their population changes are believed to indicate the effects of management activities. In the selection of management indicator species, the following categories shall be represented where appropriate: [1] Endangered and threatened plant and animal species identified on State and Federal lists for the planning area; [2] species with special habitat needs that may be influenced significantly by planned management programs; [3] species commonly hunted, fished, or trapped; [4] non-game species of special interest; and [5] additional plant or animal species selected because their population changes are believed to indicate the effects of management activities on other species of selected major biological communities or on water quality. On the basis of available scientific information, the interdisciplinary team shall estimate the effects of changes in vegetation type, timber age classes, community composition, rotation age, and year-long suitability of habitat related to mobility of management indicator species. Where appropriate, measures to mitigate adverse effects shall be prescribed.

(2) Planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species.

\* \* \* \* \* \*

(5) The effects of pest and fire management on fish and wildlife populations shall be considered.

(6) Population trends of the management indicator species will be monitored and relationships to habitat changes determined. -This monitoring will be done in

cooperation with State fish and wildlife agencies, to the extent practicable.

36 C.F.R. § 219.19(a)(1), (a)(2), (a)(5), (a)(6).[16]

"[MIS] are chosen as monitoring proxies for a number of other plant and animal species." *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1114 (W.D.Va.1994), *aff'd*, 61 F.3d 900 (4th Cir.1995). Section 219.19 primarily focuses on vertebrate species of fish and wildlife, but the regulations "assume that providing a full diversity of vertebrates will also maintain diversity of the invertebrates and plants." WILKINSON & ANDERSON, *supra*, at 273. Because MIS are merely a proxy for other animals and plants, the proper selection of MIS is vital. Wilkinson and Anderson explain:

> [P]lanners must choose MIS that adequately reflect the impact of management on wildlife habitats. The regulations require that MIS "shall be selected because their population changes are believed to indicate the effects of management activities." Thus, planners must justify their MIS choices based upon the extent to which those selections will ensure that adequate habitat is maintained for all existing vertebrate species. Since the Forest Service is primarily responsible for habitat maintenance, MIS proxy species should represent all major habitat types, including water habitat.

*Id.* at 302–03.

Once MIS are selected, they must be inventoried and monitored. Although the Forest Service is not required to maintain a detailed list of every plant and animal species in the management area, the Forest Service is required to inventory and monitor by collecting population data of MIS. 36 C.F.R. § 219.19(a)(1), (a)(2), (a)(6); *see also Swanson v. United States Forest Service*, 87 F.3d 339, 344 (9th Cir.1996); *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996); *Sierra Club v. United Sates Forest Service*, 878 F.Supp. 1295, 1317 (D.S.D. 1993), *aff'd*, 46 F.3d 835 (8th Cir.1995); *Krichbaum v. Kelley*, 844 F.Supp. at 1114; *Oregon Natural Resources Council v. Lowe*, 836 F.Supp. at 734. Wilkinson and Anderson

explain the requirement of inventorying and monitoring MIS populations:

> The objectives [of maintaining and improving habitat] must be stated in terms of quantity and quality of habitat and population trends of the MIS. Population objectives must ensure a viable and well-distributed population, one that is self-sustaining throughout the national forest.... Monitoring MIS populations is essential to verify and, if necessary, modify the forest plan's assumptions about the effects of timber harvesting and other management activities on wildlife.... In order to meet the monitoring requirement, planners will need to obtain adequate inventories of wildlife populations and distribution.... [The Committee of Scientists] explained, "No plan is better than the resource inventory data that support it. Each forest plan should be based on sound, detailed inventories of soils, vegetation, water resources, wildlife, and the other resources to be managed.". [T]he NFMA regulations have significantly broadened and enhanced the role of wildlife planning in the Forest Service. The central goal is to provide sufficient habitat to sustain viable and well-distributed wildlife populations in each national forest. Realistically, this goal can only be achieved by carefully selecting and monitoring management indicator species and by collecting adequate inventory data.

WILKINSON & ANDERSON, *supra*, at 303–05 (internal citations omitted).

The unambiguous language of the MIS regulations requires collection of population data. 36 C.F.R. § 219.19(a)(1) ("In order to estimate the effects of each alternative on fish and wildlife *populations,* [MIS] ... shall be identified and selected.... These species shall be selected because their *population changes* are believed to indicate the effects of management activities. In the selection of management indicator species, the following categories shall be represented where appropriate: ... additional plant or animal species selected because their *population changes* are believed to indicate the effects of man-

---

16. "All management prescriptions shall ... [p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species and provide that habitat for species chosen under § 219.19 is maintained and improved to the degree consistent with multiple-use objectives established in the plan...." 36 C.F.R. § 219.27(a)(6).

agement activities.") (emphasis added); 36 C.F.R. § 219.19(a)(2) ("Planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal *population trends* of the management indicator species.") (emphasis added); 36 C.F.R. § 219.19(a)(6) (*"Population trends of the management indicator species will be monitored* and relationships to habitat changes determined.") (emphasis added). These regulations requiring the collection of population data are consistent with the NFMA that requires collection of inventory data. 16 U.S.C. § 1604(g)(2)(B) ("The regulations shall include ... specifying guidelines which ... provide for obtaining inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids."). "[T]he viability regulation [section 219.19] requires the agencies to look to species populations—not merely to habitat for hypothetical populations." *Seattle Audubon Soc'y v. Lyons,* 871 F.Supp. 1291, 1316 (W.D.Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401.

■■■ The Forest Service interprets section 219.19 to require only habitat for MIS rather than collection of population data on the MIS.[17] In the context of analyzing whether the Forest Service must collect population data for a site-specific, environmental impact statement ("EIS") on timber sales, one court has determined that merely providing for MIS habitat is sufficient. *Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 760–63 (9th Cir. 1996) (*"Inland Empire"*). The court determined that analyzing and providing for a hypothetical habitat would satisfy section 219.19, and that failing to collect data was not arbitrary or capricious. *Id.* at 761. The court reasoned that the Forest Service's central assumption was reasonable, *i.e.*, that "maintaining the acreage of habitat necessary for survival would in fact assure [sic] a species' survival." *Id.*

The *Inland Empire* decision does not support the Forest Service's interpretation. The court was reviewing the Forest Service's compliance with section 219.19 in the context of preparing a one-time, site-specific EIS for timber sales. The court was not reviewing the Forest Service's on-the-ground compliance in managing the forest over the entire planning area. Moreover, on the evidentiary record before this court, the assumption that merely providing habitat will ensure viable populations of MIS and relieve the Forest Service of collecting population data is not reasonable. Scientific analysis of the forest land requires making assumptions—but the scientific method requires testing and verification of those assumptions from time to time. Continually testing assumptions upon which forest management decisions are based is exactly what Congress had in mind when it required the Forest Service to collect inventory data. *See* 16 U.S.C. §§ 1604(g)(2)(B), (g)(3)(C). Likewise, in promulgating regulations to determine the effects of management activities, the Secretary of Agriculture required the Forest Service to collect population data on MIS. *See* 36 C.F.R. § 219.19. Population data are to be collected

17. Federal Defendants offer the following interpretation of section 219.19:

The substance of the duty in 219.19 goes to management of habitat to support viable populations vis-a-vis direct management of species populations themselves. At bottom, it requires providing an amount and distribution of habitat adequate to support the continued persistence of vertebrate species in the planning area, given the life history of the species, the current amount and distribution of its habitat, the amount and distribution of species' ranges within the planning area, and other reasonably foreseeable protective measures.

&ast; &ast; &ast; &ast; &ast; &ast;

Thus, while the regulation calls for a certain amount of monitoring to be undertaken in assessing the status of species on a forest, 36 C.F.R. § 219.19(a)(6), individual species-specific assessments are not required. Rather, consistent with the principles of ecosystem management, the Forest Service may make use of assessments within one or more of the following categories: (1) species with habitat needs that are roughly the same; (2) a group of species generally thought to perform the same or similar ecosystem functions; and/or (3) the continued integrity and function of ecosystem(s) in which a species is found. Federal Defs.' Proposed Findings of Fact and Conclusions of Law at 95–96. In effect, the Forest Service believes that it can satisfy the requirements of 219.19 in three ways: (1) collect population data on MIS; (2) collect data on a community of various species, or (3) merely provide habitat for the MIS on the assumption that viable populations of MIS will survive.

on a "sample basis" at "intervals," and these data are to be "current." 36 C.F.R. § 219.12(d), (k). Without actually collecting population data of MIS, the Forest Service cannot determine whether it is, in reality, maintaining viable populations of MIS.

The court determines that the Forest Service's interpretation of section 219.19 is plainly erroneous and inconsistent with the regulation itself and section 1604(g)(2)(B). *See Robertson v. Methow Valley Citizens Council,* 490 U.S. at 359, 109 S.Ct. at 1850–51. The Forest Service is correct in concluding that section 219.19 requires the maintenance of habitat to support "viable populations of existing native and desired non-native vertebrate species." But, the Forest Service ignores the clear statutory and regulatory commands to simultaneously verify, through collecting population data, that MIS are surviving in those habitats. The Forest Service must collect inventory data to evaluate its management activities—not simply assume that its management activities are sound based on the provision of a hypothetical habitat. In developing inventorying and monitoring requirements, Congress, the Secretary of Agriculture, and the Committee of Scientists clearly intended that the Forest Service collect data to determine the actual effects of various forest management decisions. In fact, the Forest Service carries this intent into its own planning documents. Now that the Forest Service has failed to comply on-the-ground with the NFMA, regulations, and its 1987 and 1996 LRMPs in collecting population data on MIS, the Forest Service seeks to put a new gloss on the NFMA and related inventorying and monitoring regulations. This new gloss, however, is plainly erroneous and inconsistent with the law, and therefore this court is not bound by the Forest Service's interpretation proposed for purposes of trial.

With respect to monitoring and inventorying diversity, section 219.26 of the regulations provides:

Forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. *Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition.* For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices. (Refer to § 219.27(g).)

36 C.F.R. § 219.26 (emphasis added). Noting the vagueness of the term "diversity," one court has held that the MIS approach combined with a site-specific, biological evaluation before a timber sale was sufficient to satisfy the inventory requirement of section 219.26. *Krichbaum v. Kelley,* 844 F.Supp. at 1114. Inventorying under this interpretation for maintaining "diversity of plant and animal communities and tree species," however, may not be sufficient for two reasons. First, the MIS approach is primarily concerned with maintaining viable populations of fish and wildlife species and does not require any inventory of tree species. Second, a site-specific, biological evaluation is not sufficient to evaluate "diversity in terms of its prior and present condition." If, however, the Forest Service adequately inventories and monitors properly selected MIS, tree species, and plant species (if not adequately represented in the MIS), then the Forest Service would be acting within its discretion in evaluating diversity.

■ Plaintiffs argue that the Forest Service is required to conduct site-specific inventorying and monitoring before and after timber harvesting. While this may be an optimal approach to evaluating management activities, the NFMA and regulations do not explicitly require this method. The Forest Service has discretion to use this site-specific method if appropriate, but the regulations require inventorying and monitoring only at "intervals" and on a "sample basis to determine how well objectives have been met and how closely management standards and guidelines have been applied." 36 C.F.R. § 219.12(k). The Forest Service has broad discretion to determine the appropriate interval to inventory and monitor the forest resources, but that interval must be rational. *See Louisiana ex rel. Guste v. Verity,* 853 F.2d at 329 (noting that a court must hold the Forest Service to "certain minimal stan-

dards of rationality"). A rational interval would be one that permits the Forest Service to achieve the objectives of inventorying and monitoring, *i.e.*, protect forest resources and guide forest management planning.

In sum, the NFMA and regulations create five broad requirements for inventorying and monitoring. First, the Forest Service must inventory and monitor the forest resources (*i.e.*, fish and wildlife, soil, watershed, recreation, esthetic, and timber). In inventorying and monitoring the forest resources, the Forest Service must evaluate the effects of management practices on the resources. Second, with respect to the fish and wildlife resources, the Forest Service must select, inventory, and monitor MIS populations. Third, the Forest Service must collect inventory data that permits evaluation of diversity in terms of its prior and present condition. Fourth; the Forest Service must inventory and monitor to determine whether it is meeting objectives and adhering to management standards and guidelines. Fifth, the Forest Service must ensure research to evaluate the effects of management practices. The Forest Service, of course, has discretion in choosing its methods of inventorying and monitoring. *See Sierra Club v. Espy,* 38 F.3d at 800; *Sierra Club v. Robertson,* 810 F.Supp. 1021, 1029 (W.D.Ark.1992) (noting that the Forest Service has considerable discretion in inventorying), *aff'd,* 28 F.3d 753 (8th Cir.1994). This discretion, however, must be rational and within the boundaries of the NFMA and regulations. *See Sierra Club v. Espy,* 38 F.3d at 800–01.

Fish and Wildlife

Plaintiffs have not carried their burden of showing that the Forest Service's selection of MIS was arbitrary or capricious under the 1987 or 1996 LRMPs. Plaintiffs argue that, under the 1987 LRMP, the Forest Service's MIS selection favored early-successional species over mid- or late-successional species, and that this selection distort-

ed the Forest Service's evaluation of the effects of even-aged management on species population. Plaintiffs, however, did not produce sufficient evidence that the Forest Service failed to select MIS that adequately indicated the effects of management activities. The Forest Service has broad discretion in this area. *See* 36 C.F.R. § 219.19(a)(1) ("In the selection of management indicator species, the following categories shall be represented *where appropriate.*") (emphasis added).

Plaintiffs, however, have carried their burden of showing that the Forest Service has violated the MIS regulations because the Forest Service does not collect population data on MIS except for the Red–Cockaded Woodpecker, Bald Eagle, major game species, and fish.[18] The Forest Service's 1996 LRMP, which incorporates the 1996 FEIS, admits this deficiency: "Since the 1987 Plan, direct population monitoring has been limited to endangered and threatened species and major game species, through cooperation with the Texas Parks and Wildlife Department. Models have been developed for some management indicators to evaluate habitat on certain areas of the forest; *but these track capability rather than presence.*" Gov't Ex. 243A, 1996 FEIS, at F–I to F–2 (emphasis supplied). Without sufficient MIS population data, the Forest Service cannot determine the effects of its management activities on the wildlife resource.

Whatever Forest Service planning documents prescribe with respect to collection of MIS population data and inventorying the wildlife resource, the evidence shows that on-the-ground the Forest Service is neither collecting MIS population data nor otherwise inventorying the wildlife resource. The Forest Service has stepped outside its discretion and acted arbitrarily and capriciously. Accordingly, the court determines that Federal

---

**18.** Although the Forest Service's inventorying and monitoring of the fish MIS is not complete or current, the Forest Service is in the process of collecting more data. The Forest Service has set goals for collecting data on the fish MIS for all of the four National Forests in Texas, including all the streams. Therefore, on the evidentiary record before the court, the Forest Service appears to be making progress on-the-ground toward maintaining current data on the fish MIS populations. Accordingly, the Forest Service's actions are not arbitrary and capricious, and thus the Federal Defendants have not violated the inventorying and monitoring requirements with respect to the fish resource.

Defendants have violated sections 1604(g)(2)(B) and (g)(3)(C) of the NFMA and sections 219.11(d); 219.12(d), (k); and 219.19(a)(1), (a)(2), (a)(5), and (a)(6) of the regulations.

Soil, Watershed, Recreation, and Timber

With respect to the soil, watershed, recreation, and timber resources, Plaintiffs have not carried their burden of showing that the Forest Service has failed to inventory and monitor these resources. While Plaintiffs' evidence shows a number of limitations in the Forest Service's data and methods used to inventory and monitor these resources, the Plaintiffs' evidence is not sufficient to persuade the court that the Forest Service's actions have been arbitrary and capricious. For example, with respect to the soil resource, the Forest Service does not make the site-specific, field inspections required to obtain the information necessary to use the Universal Soil Loss Equation method of measuring erosion. R. 1270/5–17. This evidence, however, does not preclude the possibility that the Forest Service may have other methods of monitoring soil erosion. Plaintiffs have failed to show that the Forest Service is not employing other supplementary methods to monitor the soil resource. Accordingly, the court determines that, on this evidentiary record, Federal Defendants have not violated the inventorying and monitoring requirements with respect to the resources of soil, watershed, recreation, and timber.

Diversity

Because the Forest Service is not collecting population data for some MIS (i.e., wildlife), the Forest Service cannot evaluate diversity in terms of animal and plant species. Before diversity can be evaluated in terms of its prior and present condition, the Forest Service must establish baseline data for comparison purposes. Once adequate baseline data are collected, the Forest Service can again collect more data and begin to evaluate diversity, particularly with respect to the effects of management activities. The Forest Service is inventorying tree species by collecting data on stand age and species type. But, without collecting population data on the MIS, the Forest Service has no way to evaluate diversity of plant and animal species in terms of their existence and distribution. "Diversity, of course, can exist only if individual species survive." *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. at 1315. Therefore, by not collecting population data on the MIS (which is necessary to evaluate diversity), the Forest–Service has stepped outside its discretion and acted arbitrarily and capriciously. Accordingly, the court determines that Federal Defendants have violated section 219.26 of the regulations.

Meeting Objectives and Adhering to Standards and Guidelines

"At intervals established in the plan, implementation shall be evaluated on a sample basis to determine how well objectives [19] have been met and how closely management standards and guidelines [20] have been applied." 36 C.F.R. § 219.12(k). Because the Forest Service is not collecting population data for the wildlife MIS, the Forest Service cannot determine how well objectives have been met and how closely management standards and guidelines have been applied. For example, with respect to meeting objectives, the 1996 LRMP states the objective: "Develop habitat for threatened, endangered, or sensitive species not provided on privately owned forests and grasslands, while provid-

**19.** The regulations define "objective" as: "A concise, time-specific statement of measurable planned results that respond to pre-established goals. An objective forms the basis for further planning to define the precise steps to be taken and the resources to be used in achieving identified goals." 36 C.F.R. § 219.3. The regulations define "goal" as: "A concise statement that describes a desired condition to be achieved sometime in the future. It is normally expressed in broad, general terms and is timeless in that it has no specific date by which it is to be completed. Goal statements form the principal basis from which objectives are developed." *Id.*

**20.** The 1987 LRMP provides an explanation of "standards and guidelines":

Management requirements to achieve goals and objectives are referred to as standards and guidelines (S & G's). These state the bounds of constraints within which management practices will be performed. Forest-wide standards and guidelines apply to all management areas and possibly to all alternatives considered. Some standards and guidelines apply only to a particular management area.

Gov't Ex. 15, 1987 LRMP, at IV–31.

ing populations of other species that occur within Forest and Grassland successional stages." Gov't Ex. 243A, 1996 LRMP, at 45. Because the Forest Service is not collecting sufficient MIS population data, the Forest Service is not able to determine whether it is meeting its objective of providing sufficient populations of animal and plant species. Similarly, the Forest Service will not know whether it is closely adhering to the standards and guidelines that are used to achieve the related objectives and goals, *i.e.*, those standards and guidelines related to providing for maintaining viable populations of existing native and desired non-native vertebrate species in the planning area. Accordingly, the Federal Defendants have violated section 219.12(k) of the regulations.

Research

■ With respect to the Forest Service conducting research on its management activities, Plaintiffs did not carry their burden of showing that the Forest Service does not ensure research to evaluate the effects of management practices. In fact, Plaintiffs neither presented any appreciable evidence nor requested any findings of fact on this issue. Accordingly, the court determines that Federal Defendants have not violated section 1604(g)(3)(C) of the NFMA (with respect to the research requirement only) or section 219.28(a) of the regulations with respect to research.

Conclusion

The Forest Service has not adequately inventoried and monitored for wildlife MIS, diversity, and whether it is meeting objectives and adhering to standards and guidelines. The Forest Service's failure to adequately inventory and monitor may be causing permanent and substantial damage to the productivity of the land. Sufficient inventorying and monitoring of forest resources is vital to making sound, forest management decisions and ultimately protecting the forest resources from permanent impairment. Apparently, inventorying and monitoring is an area of forest management that is often neglected. In advising on the promulgation of the regulations under the NFMA, the Committee of Scientists noted that the Forest Service has a

long history of failing to collect inventory data necessary to make sound decisions about forest management. Wilkinson and Anderson explain:

In 1979 the Committee of Scientists felt that current resource inventory data would be inadequate to support judgments made in NFMA plans:

Unfortunately, it does not follow that truly adequate resource data will be available to support the development of every plan. In many cases, inventory data are too fragmentary or insufficiently detailed to allow firm judgments in developing management programs of the complexity demanded by RPA/JNFMA. In other cases, data on certain organisms, resources, or management effects have simply never been gathered.

The Committee's prognosis for the first round of plans was not hopeful: "In practice, what this means is that the data base for a number of plans is likely to be marginally adequate or even shaky." Six years later [1985] it remains evident that there is not sufficient data to justify all wildlife management decisions. The plans will have to be considered with sensitivity both to the central role of good inventories in resource planning and the scope of the task, as evidenced by the Committee's words in 1979: "Even if a Federal Government-wide crash program of data acquisition and storage were to begin tomorrow, it would not provide adequate data in time to be of much value in developing the first forest plans.... [T]he Forest Service cannot remedy decades of national indifference toward basic resource data in 5 years."

WILKINSON & ANDERSON, *supra*, at 305 (internal citations omitted).

Plaintiffs may have been able to carry their burden on the issues of ensuring diversity and protecting the key resource of wildlife had the Forest Service collected adequate inventory data and conducted sufficient monitoring. It is nearly impossible to determine with any legal certainty whether the Forest Service is ensuring diversity and protecting the wildlife resource unless the Forest Service complies with the inventorying

and monitoring requirements of the NFMA. Once the Forest Service comes into compliance with the inventorying and monitoring requirements, the Forest Service and other interested parties will have a better idea of whether the Forest Service's planning decisions and activities on-the-ground are within its sound discretion and thus in compliance with the NFMA and regulations.

### DECLARATORY AND INJUNCTIVE RELIEF

The federal declaratory judgment statute provides: "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Declaratory Judgment Act, 28 U.S.C. § 2201(a). "The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." FED. R. CIV. P. 57. "The existence or non-existence of any right, duty, power, liability, privilege, disability, or immunity[,] or of any fact upon which such legal relations depend, or of a status, may be declared. The petitioner must have a practical interest in the declaration sought...." FED. R. CIV. P. 57 Advisory Committee's Note. The declaratory-relief plaintiff bears the burden of proving the requirements for a declaratory judgment, i.e., existence of a dispute within federal-court subject matter jurisdiction. State of Texas v. West Publishing Co., 882 F.2d 171, 175 (5th Cir.1989). "The Declaratory Judgment Act .... gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." Public Affairs Assocs. v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 581, 7 L.Ed.2d 604 (1962). The district court's decision to grant declaratory relief is discretionary. Magnolia Marine Transp. Co. v. Laplace Towing Corp., 964 F.2d 1571, 1581 (5th Cir. 1992). A declaration is appropriate in this action and would serve the purposes of the Declaratory Judgment Act.

Accordingly, the court determines and declares: Under section 706(2)(A) of the APA, the Federal Defendants' actions or failure to act have been "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," i.e., the NFMA and regulations. Specifically, Federal Defendants have neither protected the key resources of soil and watershed nor adequately inventoried and monitored for wildlife, diversity, and whether the Forest Service is meeting objectives and adhering to standards and guidelines. Federal Defendants have violated and are continuing to violate:

(1) with respect to protection of the soil resource, sections 1604(g)(3)(E)(i) and (g)(3)(F)(v) of the NFMA and sections 219.27(a)(1), (b)(5), (c)(6), and (f) of the regulations;

(2) with respect to protection of the watershed resource, sections 1604(g)(3)(E)(i), (g)(3)(E)(iii), and (g)(3)(F)(v) of the NFMA and sections 219.27(a)(1), (a)(4), (b)(5), (c)(6), (e), and (f) of the regulations;

(3) with respect to inventorying and monitoring for wildlife, sections 1604(g)(2)(B) and (g)(3)(C) of the NFMA and sections 219.11(d); 219.12(d), (k); and 219.19(a)(1), (a)(2), (a)(5), and (a)(6) of the regulations;

(4) with respect to inventorying and monitoring for diversity, section 219.26 of the regulations; and

(5) with respect to inventorying and monitoring for whether the Forest Service is meeting objectives and adhering to standards and guidelines, section 219.12(k) of the regulations.

Because Plaintiffs did not carry their burden, the court determines that the Federal Defendants are not in violation of the NFMA and regulations with respect to the issues of (1) ensuring diversity; (2) protecting the key resources of fish, wildlife, recreation (including esthetic), and timber; (3) inventorying and monitoring of fish, soil, watershed, recreation (including esthetic), and timber; and (4) adequate research.

The Administrative Procedure Act provides an injunctive remedy for "agency action unlawfully withheld or unreasonably delayed ... [or] found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(1), (2)(A); see National Wildlife Fed'n v. Espy, 45 F.3d 1337, 1343 (9th

Cir.1995); *Hondros v. United States Civil Service Comm'n,* 720 F.2d 278, 298 (3d Cir. 1983) (citing cases from the Tenth and District of Columbia Circuits for the proposition that "section 706(1) is a source of injunctive relief to remedy an arbitrary or capricious delay or denial of agency action"). Section 706, however, does not authorize monetary damages. *Westlands Water Dis. v. Firebaugh Canal,* 10 F.3d 667, 673 (9th Cir.1993). "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202. A declaratory judgment can be used as a predicate to further relief, including an injunction. *Powell v. McCormack,* 395 U.S. 486, 499, 89 S.Ct. 1944, 1952, 23 L.Ed.2d 491 (1969).

 An injunction is an equitable remedy—"not a remedy which issues as of course ... or to restrain an act the injurious consequences of which are merely trifling." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (internal quotation marks and citations omitted). The language of section 706 of the APA is mandatory: "The reviewing court shall-(1) compel agency action unlawfully withheld or unreasonably delayed ..." 5 U.S.C. § 706. In determining whether to order injunctive relief under this provision, however, a court must exercise sound discretion because the remedy is extraordinary. *See Weinberger,* 456 U.S. at 312, 102 S.Ct. at 1803; *Canal Authority of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

 The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a likelihood of success. *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987). Thus, four elements are required for a permanent injunction: (1) actual success on the merits; (2) a substantial threat of irreparable injury to the plaintiff if the injunction is not granted; (3) the

irreparable injury threatened to the plaintiff must outweigh the threatened injury of any injunction to the defendant; and (4) the granting of the permanent injunction must not disserve the public interest. *Cherokee Pump & Equip., Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994); *Canal Authority of Florida v. Callaway,* 489 F.2d at 572. Plaintiffs having succeeded on the merits, the court turns to the remaining elements.

 The second element requires a showing of a substantial threat of irreparable injury if the injunction is not granted. In making a showing of irreparable injury, the plaintiff should also show an inadequate remedy at law. *Weinberger,* 456 U.S. at 312, 102 S.Ct. at 1803. The threat of irreparable injury must be imminent. *Humana Inc. v. Jacobson,* 804 F.2d 1390, 1394 (5th Cir.1986). Namely, the plaintiff must show " 'there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.' " *Shanks v. City of Dallas,* 752 F.2d 1092, 1097 (5th Cir.1985) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953)).

Plaintiffs have shown a substantial threat of irreparable injury if the injunction is not granted. Federal Defendants' past and continuing violations of the NFMA and regulations have caused and continue to cause irreparable injury to the soil and watershed resources. The continuing violations of the inventorying and monitoring requirements are also causing irreparable injury because population baselines of wildlife that could be established are forever lost as time passes and the Forest Service fails to collect data. The present failure to collect this data forecloses any possibility that the Forest Service can (1) ensure that viable populations of vertebrate species are well distributed, (2) evaluate diversity in its prior and present condition, and (3) determine whether the Forest Service is meeting objectives and adhering to standards and guidelines. These irreparable injuries to the forest resources likewise cause irreparable injury to the Plaintiffs' enjoyment of the forest resources.[21]

---

**21.** Plaintiffs do not have an adequate remedy at law. The APA does not provide for recovery of monetary damages, and the Forest Service's continuing noncompliance with the NFMA and regu-

lations is causing irreparable injury to the forest land. This irreparable injury to the environment

Timber Intervenors argue: "It cannot be assumed that any NFMA violations that have occurred in the past would be repeated under the more stringent environmental standards in the [1996 LRMP]." Timber Intervenors' Closing Argument on the NFMA Issues at 27. Certainly, *past* violations and the substantial and permanent damage caused by those violations is an irreparable injury that cannot be cured by an injunction. Reoccurring violations, however, can be the subject of an injunction. Whatever the Forest Service's planning documents provide, the Forest Service must, in reality, comply with the NFMA and regulations on-the-ground. In reviewing the evidence, the court found a wide gap between what the Forest Service represents in its planning documents and what it actually does on-the-ground.

For example, the 1987 LRMP required the Forest Service to collect population data on all MIS, but at trial the Forest Service admitted that it did not collect population data because it was not "practical." Although the 1996 LRMP requires the collection of population data on some "management indicators," there are no guarantees in the Plan that ensure performance on-the-ground. Compliance with the law is not forth coming because at trial the Forest Service took the position that it did not have to collect population data but only provide for habitat capability through the use of a computer model. Another example of the gap between planning and performance is that despite the Forest Service's "planning" prohibition of cutting in streamside management zones for commercial purposes, substantial photographic evidence at trial showed that these areas were routinely ignored, permitting cutting through the zone and the deposit of logging debris in the streams.

The third element requires a showing that the irreparable injury threatened to the plaintiff outweighs the threatened injury of an injunction to the defendant. The court determines that the irreparable injury to the environment and Plaintiffs far outweighs any harm caused by an injunction. Federal Defendants may lose revenue if the court enjoins the sale of timber contracts. Timber Intervenors' members may have to obtain another source of timber from private holdings or other National Forests if the court enjoins the sale of timber. These harms that an injunction may cause, however, are certainly outweighed by the permanent and grave harm to the forest land that is caused by the Forest Service's past and ongoing violations of the NFMA and regulations. The Supreme Court has stated: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod,* 480 U.S. at 545, 107 S.Ct. at 1404.

The fourth element requires a showing that the granting of the permanent injunction must not disserve the public interest. The court is cognizant of the public's interest in a supply of timber from the National Forests in Texas and in the economic benefits associated with timber harvesting. The 1996 LRMP states: "The National Forests in Texas contain 5.3 percent of the approximately 11.6 million acres of timberland in East Texas; however over 20 percent of all East Texas sawtimber is produced on National Forest land.... The [National Forests in Texas have] historically supplied three percent of the timber harvested in Texas." Gov't Ex. 243A, 1996 LRMP, at 16. The public, however, also has a compelling interest in proper forest management so that the forest resources are sustained in perpetuity and not permanently damaged. Congress had this public interest in mind when it enacted the Multiple–Use Sustained–Yield Act of 1960 ("MUSYA"). MUSYA requires (1) that the National Forests be managed for the "multiple use" of various renewable resources, including "recreation, range, timber, watershed, and wildlife and fish," and (2) that the "periodic output" of such resources be maintained "in perpetuity ... without impairment of the productivity of the land." 16 U.S.C. §§ 528, 529, 531. Accordingly, the court determines that the public interest would be served by an injunction that pre-

is an injury for which the law does not provide an adequate remedy.

vents ongoing substantial and permanent impairment of the forest land.

■ Upon determining that injunctive relief is appropriate, a court must carefully craft an injunction that reconciles any competing equities. "[I]njunctions must be narrowly drawn and precise." *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir.1992). The inadequate implementation of past timber sales is causing substantial and permanent damage to the soil and watershed resources (and perhaps wildlife as well for failure to monitor). The continued implementation of these past sales, however, could be modified to prevent further damage to the forest land. Under section 706(1) of the APA, the court could order mandatory injunctive relief to compel the Forest Service to immediately comply with the law. In deference to the Forest Service, however, the court will not order mandatory relief because it may unduly interfere with the Forest Service's management of the forest resources. The court is concerned that the Forest Service may not have the funds appropriated to simultaneously comply with a mandatory injunction and continue to adequately manage other forest resources.

To prevent continuing substantial and permanent damage to the forest land, however, the court determines that it is necessary to enjoin future timber harvesting until such time that the Forest Service (1) complies with the NFMA and regulations with respect to the implementation of past timber sales and (2) assures the court that any future timber harvesting will be in compliance on-the-ground. Under current management practices, further timber harvesting would only exacerbate the continuing substantial and permanent damage to the forest land. Therefore, the court hereby ENJOINS the Federal Defendants and Timber Intervenors from engaging in timber harvesting under any method (even-aged or otherwise) unless such harvesting is for insect or disease control, fire protection, or any other reason necessary to maintain the health of the forest land. This injunction is effective immediately and binds all Defendants to this action as well as those (1) identified with them in interest, (2) in privity with them, (3) subject to their control, or (4) otherwise represented by them. *See Parker v. Ryan*, 960 F.2d 543, 546 (5th Cir.1992). This injunction remains in effect until further order of the court. Defendants shall immediately serve actual notice of this injunction on all persons or entities engaged in timber harvesting in the National Forests in Texas. At any time, the parties may petition the court to modify the injunction.

By its findings of fact, conclusions of law, and judgment of declaratory and injunctive relief, the court is not suggesting that the Forest Service is barred from using even-aged management after the injunction is lifted. Whatever the costs of choosing even-aged management over another system of management, Congress has determined that even-aged management may be used by the Forest Service under certain circumstances outlined in the NFMA. Additionally, the court is not suggesting that the Defendants cease any particular forest management practice or adopt another in its place. In most circumstances, the selection of particular forest management practices under the NFMA and regulations is left to the Forest Service's rational and informed discretion. Within this discretion, however, the Forest Service must ultimately comply with the NFMA and regulations.

As noted in *Sierra Club v. Espy*, 38 F.3d at 800, the National Forests are subject to multiple uses, and the NFMA does not require the maintenance of the status quo or a pristine environment. The National Forests are managed for obtaining a sustained yield of various resources, and of course the mix of forest resources changes, requiring at times trading one resource for another in a particular area of the forest. In making these trade-offs, however, the Forest Service cannot substantially and permanently damage the productivity of the forest land. Regrettably, the evidence at trial showed that past and continuing on-the-ground management practices of implementing timber sales has substantially and permanently damaged the soil and watershed resources.

The Forest Service has a difficult task managing the forest lands in a way that sustains a yield of all key forest resources. Compliance with the NFMA and regulations is not easy, but it is necessary to ensure a

sustained yield of forest resources in perpetuity for the public good. The Forest Service indicated at trial that it is operating under budgetary constraints and "very short-handed." R. 805/21, 1039/18–25, 1382/11–16. But, with sufficient agency resources, the court is confident that the Forest Service can bring its on-the-ground management into compliance. At trial, the court observed that the Forest Service professionals who testified were competent and knowledgeable about forest management. The court's determination that the Forest Service has violated the NFMA and regulations should not necessarily reflect on the performance of any particular individual within the Forest Service.

### POST JUDGMENT MATTERS

The court will sign a judgment consistent with this opinion and order. The court instructs the Clerk of Court to enter the judgment on the docket on August 14, 1997. By the court's calculation, the parties' post-judgment motions are due August 28, 1997. Along with any post-judgment motions the parties may wish to file, the parties are hereby ORDERED to submit briefing on the following issues: (1) scope of the current injunction and any necessary modification thereof and (2) appointment of a master under FED.R.CIV.P. 53 or expert under FED. R. EVID. 706 (including the issues of shifting costs to Defendants). The court anticipates that a master or expert may be necessary once the Federal Defendants move to demonstrate compliance with the law and to lift the injunction. The court anticipates holding a hearing once the parties submit post-judgment briefing to the court.

Under Rule 54(b), the court expressly determines that there is no just reason to delay an entry of final judgment as to the claims determined in this opinion and order.